(Decided 16th January, 1891.)

ARTHUR W. MACHEN, Trustee, and AMANDA C. DE FORD *vs.* WILLIAM E. HOOPER and others, trading as William E. Hooper & Sons.

*Contract of Lease—Construction—Destruction of Warehouse from Alleged over-storage—Question of Liability therefor under the Covenants in the Lease.*

A lease of a warehouse, not under seal, contained a number of agreements, therein styled covenants. There was a provision for a suspension of the rent in case of destruction by fire or by the act of God, or by anything done or occurring without the fault of the lessees, and for a rebuilding, under certain circumstances, at the expense of the lessors. There was an agreement that the lessees might at their own expense make alterations in the building which should not affect its safety or strength and durability. The lessees, who were the parties of the third part, covenanted that they would be "liable and answerable for any and all damage or injury, other than loss or damage by fire, not suffered by breach of any covenant herein contained on the part of the parties of third part to be performed, which during their occupation thereof, shall occur to the said building, or any part thereof, by or by reason of any act or thing done or occurring within said premises or building, and also for any act or thing done or occurring outside thereof, by the said parties of the third part, their servants, employés, or tenants, or otherwise by their authority or consent, but shall not be responsible for damage by fire unless not covered or protected by insurance, by failure on

Machen and De Ford *vs.* Hooper.

their part to comply with some of the stipulations or covenants of these presents, nor by act of God, or act or acts of third persons done or committed outside of the said demised premises without the participation, authority, or consent of the said parties of the third part." And in a subsequent part of the lease they covenanted that at the end of the term they would quietly surrender to the lessors "the said demised premises and building in the same good order and condition that they now are in, ordinary wear and tear, loss by fire, (other than as herein above specially provided against) act of God, and damage caused by external accident or acts of third parties. as hereinbefore particularly mentioned, together with the addition and improvements by the said parties of the third part thereto or therein added or made, in good order, as aforesaid, unless such addition shall have been required by the lessors or their assigns to be removed under the succeeding covenant." And the lessees further covenanted that, if required by the lessors, they would restore the building to the same state and condition in which it then was, ordinary wear and tear excepted. During the term of said lease the warehouse fell and became a mass of ruins. In an action for damages brought upon the covenants in the lease by the lessors against the lessees, it was HELD :

1st. That the reasonable inference to be drawn from all the terms of the lease considered together, and in connection with the condition of things in which it had its origin, was that the lessees contracted to make good any damage which they themselves should cause, and not that they agreed to incur an indefinite liability which might arise from causes over which they could have no control.

2nd. That if the fall of the building was attributable to alterations made in it by the defendants, in connection with the use thereafter made of it by them, the plaintiffs were entitled to recover.

3rd. That if the fall was owing to the excessive quantity of goods stored in the building by the defendants, or to the manner in which they were stored, the plaintiffs were entitled to recover.

4th. That the burden of proof was upon the defendants, to show that the building fell in consequense of ordinary wear and tear; and unless this was shown the verdict should be for the plaintiffs.

5th. That if the defendants used the building as persons of ordinary care and prudence would have done, looking to its character,

size, apparent construction, and strength, and it fell down in consequence of some defect it its structure, or on account of a want of proper thickness of the wall, or on account of the ordinary decay of the materials, and all these matters were unknown to the defendants, and could not have been discovered by reasonable and ordinary diligence, the plaintiffs were not entitled to recover.

6th. That it was not to be assumed *prima facie* that alterations made in the building by the lessees, under authority granted in the lease were improperly made; and an averment that they were so improperly made ought to be proved by the party making the charge.

7th. That the jury had a right to consider the purpose for which the warehouse was built, and for which it had been used, and also its apparent strength and storage capacity, and the business in which the defendants were engaged when they rented it, and to find whether as men of ordinary prudence and sagacity, they were justified in believing it was strong enough to bear the weight of the goods which they stored in it.

8th. That it was not incumbent on the defendants to ascertain, by the aid of persons skilled in such matters, the limits of the capability of the building to bear the weights the defendants proposed, from time to time, to put upon it.

9th. That the fact that the building fell because of the weight of the goods stored in it, or the manner in which they were stored, would not render the defendants liable unless the weight of the goods was unreasonable and excessive, or they were not stored in a cautious, prudent and skilful manner.

APPEAL from the Baltimore City Court.

This is an action of damages brought by the appellants against the appellees upon the covenants contained in the following lease:

This lease, made this sixth day of June, in the year eighteen hundred and seventy-nine, between Arthur W. Machen, trustee, of the City of Baltimore, and State of Maryland, of the first part, Amanda C. De Ford, of the City of Mobile, and State of Alabama, of the second part, and William E. Hooper, William J. Hooper, Theo-

dore Hooper and James E. Hooper, co-partners, trading under the name of William E. Hooper & Sons, of the said first mentioned place, of the third part:

Witnesseth, that the said Arthur W. Machen, trustee, and Amanda C. De Ford, (the said Arthur W. Machen acting in exercise of the powers vested in him by a deed of trust from Samuel Mactier Winchester and Lilly V. Winchester, his wife, dated the eleventh day of May, A. D. 1875, and duly recorded among the land records of Baltimore City, confirmed by a deed from the same grantors to him, the said Machen, dated the eleventh day of June, A. D. 1875, recorded among the said land records in Liber G. R., No. 704, folio 113, &c.,) do, in consideration of the payment of the rent hereinafter reserved, and the performance of the covenants on the part of the parties of the third part to be performed, hereinafter mentioned, hereby demise and let unto the said William E. Hooper, William J. Hooper, Theodore Hooper and James E. Hooper, co-partners as aforesaid, all that lot of ground lying in the City of Baltimore, fronting on the east side of South Gay street, described in an indenture of lease, dated the nineteenth day of April, 1853, made between Emily L. Harper of the one part, and Charles D. De Ford of the other part, recorded among the land records of Baltimore City, in Liber E. D., No. 34, folio 111, &c., and in a deed from the said Emily L. Harper to William Y. De Ford, executor of Charles D. De Ford, deceased, dated the 22nd day of April, 1862, recorded among said land records, in Liber C. E. S., No. 216, folio 245, &c., together with the building or warehouse thereon, which said lot and building are known as "Number 37 South Gay street."

To have and to hold the said lot of ground and premises, with the appurtenances, unto the said Wm. E. Hooper, William J. Hooper, Theodore Hooper and James E. Hooper, copartners as aforesaid, for the term of five

years, accounting from the fifteenth day of May, in the year eighteen hundred and eighty, yielding and paying therefor yearly unto the said Arthur W. Machen, trustee, his successors and assigns, and the said Amanda C. De Ford, her executors, administrators and assigns, the rent of three thousand dollars, payable every year during the said demise, in equal quarterly instalments of seven hundred and fifty dollars each, payable on the fifteenth days of August, November, February and May in each and every year; the said yearly rent to be payable, one-half to the said Arthur W. Machen, trustee as aforesaid, and the other half (subject to the operation of a mortgage from Charles D. De Ford, Junior, to William Y. De Ford, guardian of Lilly V. De Ford, now Lilly V. Winchester, dated the nineteenth day of January, 1869, recorded in said land record, in liber G. R., No. 400, folio 456, &c., assigned by the said William Y. De Ford to the said Lilly V. Winchester, and by the said deed of trust and confirmatory deed assigned in trust to the said Arthur W. Machen,) to the said Amanda C. De Ford.

Provided that in case of any default in the payment of the said rent, or any part thereof, or breach of any of the covenants herein contained on the part of the said parties of the third part to be performed, the said parties of the first and second parts, their representatives, successors or assigns may re-enter; and provided also, that if the said rent shall be in arrear in the whole or in part at any time, it shall be lawful for the said Arthur W. Machen, his successor or successors in trust, or his or their assigns, and the said Amanda C. De Ford, her executors, administrators or assigns, to make distress therefor; provided, that if the said building hereby demised, or any part thereof, shall at any time during said term be burnt down or so damaged by fire, or by the act of God, or by reason of anything done or occurring

Machen and De Ford *vs.* Hooper.

without the fault of the said parties of the third part, their executors or administrators, and by or through some person or persons other than and unconnected with the parties of the third part, their executors or administrators, their agents, employés, tenants, servants or assigns, and without their participation, authority or consent, as to be thereby rendered unfit for occupation, or to such an extent as to interfere with the enjoyment by the said lessees of the said building, in its present condition, then and in such case the rent hereby reserved, or a proportionate part thereof, according to the extent of the damage, shall be suspended, while the said premises shall so remain so unfit for use, provided the said parties of the third part, their executors or administrators, shall have given to the said parties of the first and second parts, their successors, personal representatives or assigns, notice in writing of the said damage and extent thereof. And in case of any such damage to the said building, and the neglect or refusal of the said parties of the first and second parts, their successors, representatives or assigns, after such notice, and the lapse of one month thereafter, to set about the restoration or repair of the said damage, the said parties of the third part, their executors or administrators, may make such repairs and apply the next accruing or any accrued rent to an extent not exceeding altogether the sum of twenty-five hundred dollars, to their reimbursement, for the reasonable costs thereof.

And it is further understood and agreed, that in case of the destruction or damage of said building by fire during the said term, the said parties of the first and second parts respectively, the successor or successors in the trust of the said party of the first part, and the executors, administrators or assigns of the said party of the second part, will apply any insurance money they may receive on account thereof, so far as may be requisite, in and about the rebuilding thereof.

It is understood and agreed that the said parties of the third part, shall have the right, during the said term of years, and before the commencement thereof, in case of their entering into occupation of said premises, by assignment from the present tenants thereof of the residue of their existing term therein, or by under-letting by the said present tenants, to make at the expense of the said parties of the third part, such changes and alterations in the said building, from time to time, as may better fit it for the purposes of their occupation thereof, not however affecting the safety or integrity of the said building or impairing its strength, durability or permanency; provided, always, that no changes or alterations shall at any time be so made by them hereunder, which shall be of a nature to prevent the restoration of the said building afterwards to its present condition.

And it is understood that under this provision the said parties of the third part may open and construct a skylight or skylights in the roof, and alter or introduce a stair case or stair cases, the same being done in a safe, workmanlike and durable manner, and may also introduce an elevator or elevators, and such elevator or elevators afterwards at any time during the said term remove; provided such construction or removal of said elevator shall be so done as not to injure or impair the said building.

It is understood that no girders shall be removed or injured, nor shall any support or other structures be removed or disturbed if such removal or disturbance thereof will anywise impair the strength or stability of the building.

It is expressly agreed and understood that all skylights which may be so made, and all structures and appointments, including interior or exterior glass connected with any such skylight or skylights so made or

Machen and De Ford *vs.* Hooper.

introduced by the said parties of the third part, shall not, nor shall any part thereof, be removable by the said parties of the third part, but at the end of the said term shall be yielded up in good order, repair and condition, together with the rest of the said building, unless the said parties hereto of the first and second parts, their successors, representatives or assigns, shall, at their election at the end of the said term, require the said parties of the third part to remove the same or any of them, and restore the said building to the like state and condition it is now in as hereafter provided for. And it is agreed and provided, and the said parties of the third part hereby covenant with the said parties of the first and second parts, their representatives, successors and assigns, that they, the said parties of the third part, after they shall have entered into possession of the said premises, whether before or after the commencement of the said term of five years, shall and will be liable and answerable for any and all damage or injury other than loss or damage by fire not suffered by breach of any covenant herein contained on the part of the parties of the third part to be performed, which, during their occupation thereof, shall occur to the said building or any part thereof, by or by reason of any act or thing done or occurring within said premises or building, and also for any act or thing done or occurring outside thereof by the said parties of the third part, their servants, employés or tenants, or otherwise by their authority or consent, but shall not be responsible for damage by fire, unless not covered or protected by insurance, by failure on their part to comply with some of the stipulations or covenants of these presents, nor by act of God or act or acts of third persons done or committed outside of the said demised premises, without the participation, authority or consent of the said parties of the third part.

And the said parties of the third part further covenant with the said parties of the first and second parts, their successors, representatives and assigns, in manner following, that is to say, that the said parties of the third part will pay all water rents or rates for said demised property, all charges for gas furnished thereto, for cleaning sinks or vaults therein or appurtenant thereto, or other charges incidental to the occupation of the said premises, incurred during the said term, or their previous occupation of the said premises. That they, the said parties of the third part, will not during said term, or prior occupation by them, do or suffer or permit to be done any act or thing on said demised premises, whereby the insurance or insurances of the said building against loss or damage by fire shall be affected or impaired. That they, the said parties of the third part, will pay any additional premium or premiums of insurance over and above those paid or payable by the said parties of the first and second parts of those under the now existing policies on said building, by reason or in consequence of the occupation or use by the said parties of the third part of the said premises or building, or by reason of any carpenters' work, or other work which they may cause or permit to be done in or upon said premises. That they, the said parties of the third part, will not store, deposit, or keep or permit, or suffer to be stored, deposited or kept, any coal oil or any inflammable or hurtful product thereof, (except such moderate quantity thereof at any one time as the said parties of the third part shall reasonably require for the prosecution of their own business) in any part of said building or demised premises, nor store, or keep in any part of said building, except the cellar thereof, any molasses or other article or substance capable of causing lasting injury to the floors or walls of said building. That they, the said parties of the third part, will not at any time

during the said term or previous occupation of the said parties of the third part, assign the said term or premises without the consent, in writing of the said Arthur W. Machen, his successor or assigns, and of the said Amanda C. De Ford, her executors, administrators or assigns, and also will not, without such consent in writing, of the said parties of the first and second parts, their successors, representatives or assigns, underlet any part of said demised premises or building, except as offices and for use as such; and that at the end of the said term the said parties of the third part will quietly surrender and yield up to the said parties of the first and second parts, their successors, representatives or assigns, the said demised premises and building in the same good order and condition they now are in, ordinary wear and tear, loss by fire, (other than as hereinabove specially provided against,) act of God, and damage caused by external accident or acts of third parties, as hereinbefore particularly mentioned, together with the addition and improvements by the said parties of the third part thereto or therein added or made, in good order as aforesaid, unless such addition shall have been required by the said parties of the first and second parts, or their assigns, to be removed under the succeeding covenant.

And that the said parties of the third part, their executors and administrators, before the end of the said term, will, if required by the said Arthur W. Machen, trustee, his successor or successors in the trust, or his or their assigns, and the said Amanda C. De Ford, her executors, administrators or assigns, restore the said building to the same state and condition it now is in, ordinary wear and tear excepted.

It is understood and agreed that at or before the end of the said term the said parties of the third part shall have the right and privilege of removing and taking away

Machen and De Ford *vs.* Hooper.

any removable fixtures by them introduced into said building, not herein otherwise specially provided for, provided that such removal thereof can and shall be so done without in any manner injuring, impairing or defacing the said building in the condition in which it shall then be, and as improved by permanent additions made thereto by the said parties of the third part, or, in case of the election of the said parties of the first and second parts, their successors, representatives or assigns, to have the same restored to its present condi· tion, then as it shall be in such its restored condition.

And the said Arthur W. Machen, trustee, as such trustee only, and in so far as his right, power, estate and authority as trustee in the premises may extend, and no further, covenants and agrees with the said parties of the third part, that the said parties of the third part, upon paying the said yearly rent in manner hereinabove reserved and provided, and observing and performing all the covenants, agreements and conditions on their part to be observed or performed hereinabove expressed, may peaceably and quietly hold and enjoy the said demised premises during the term hereby granted, in manner herein above provided, without any eviction or disturbance by him, the said Arthur W. Machen, trustee, or any other person or persons lawfully claiming by, from or under him; and the said Amanda C. De Ford, for herself, her executors and administrators, covenants and agrees with the said parties of the third part, that the said parties of the third part, upon paying the said yearly rent and observing and performing all the covenants, agreements and conditions on their part to be observed or performed, herein above expressed, may peaceably and quietly hold and enjoy the said demised premises during the term hereby granted, in manner hereinabove provided, without any eviction or disturbance by her, the said Amanda, or any other person or persons lawfully claiming by, from, or under her.

In witness whereof, the said parties hereto have the day and year first above mentioned, hereto subscribed their names in duplicate.

The lease was duly signed by A. W. Machen, trustee, Amanda C. De Ford and William E. Hooper & Sons, and properly tested.

The case is stated in the opinion of the Court.

*Exception.*—The evidence on both sides being closed, the plaintiffs offered the seven prayers following:

1. That the covenant in the lease in question by which the defendants undertook to be responsible to the plaintiffs for any and all damage or injury, other than loss or damage by fire, which during their occupation of the demised premises should occur to the building thereon, by, or by reason of any act or thing done or occurring within said premises or building, was not qualified by the exception of ordinary wear and tear contained in the covenants for the surrender of the premises at the end of the term, also to be found in the lease, and if the jury find that a large portion of the said building was caused to fall down by the use made of said building by the defendants, then the plaintiffs are entitled to a verdict for such damages as the jury shall find the plaintiffs sustained by said fall.

2. If the jury find that the injury shown by the evidence to have been sustained by the building in question, occurred while the same was in the occupation of the defendants under the lease offered in evidence, and that the said injury is attributed to the alterations made in the building by the defendants in connection with the use thereafter made of it by them, then the plaintiffs are entitled to recover in this action the damages which the jury may find from the evidence they have thereby suffered.

3. If the jury find that the defendants, under the authority given in the lease to make alterations, altered the building in the manner shown in the evidence, and afterwards made use of it in its altered condition; and shall further find that while they were so using the same a large part of the building fell down, then the burden of proof is upon the defendants to satisfy the jury that such alterations did not contribute to cause such fall, and unless they do so, the verdict must be for the plaintiffs.

4. That if the jury find that the defendants entered into possession of the building in question under the lease in evidence, and made such alterations as they thought fit in order to adapt it to their purposes under the authority given in the lease, and afterwards stored a large quantity of heavy goods therein, and that owing to the excessive quantity of the said goods, if they shall find such quantity was excessive, or the manner in which they were stored by the defendants, a large part of the building was caused to fall down, then the plaintiffs are entitled to recover.

5. That there is no evidence that the building in question was let to be used for heavy storage purposes, or any other particular use, and if the jury find that the defendants entered and occupied the same under the lease in evidence, and made the alterations they desired as mentioned in the evidence, and afterwards used the building for the storage of heavy goods, it was incumbent on them to ascertain, as far as practicable, the limits of the capability of the building to bear the weights they, from time to time, proposed to put upon it, and for that purpose to obtain, if necessary, the aid of persons skilled in such matters.

6. That the burden of proof is upon the defendants to show that the building fell in consequence of ordinary wear and tear, and unless they do show that the fall of

the building was so caused the verdict should be for the plaintiffs.

7. That if the jury find that the defendants, after the execution of the lease offered in evidence, made alterations in the building in question under the. authority thereby conferred, and afterwards applied the fourth and fifth stories to the use of women employed by them in working upon netting, and stored goods in the second and third stories, and shall further find that the said building was, and continued to be, adequately strong for the uses so made of it by the defendants, and was strong enough for other uses to which it might have been put by the defendants, and shall further find that after the lapse of some years, and before the expiration of the term mentioned in the lease, the defendants stopped using the fourth and fifth stories for the said net manufacturing business, and used the said two stories, as well as the second and third stories, for storing goods, and that by the use so latterly made of the building by the defendants, and of the weight of the goods so stored in said four upper stories, or the manner in which they were stored, a large part of the said building was caused to fall down, then the verdict should be for the plaintiffs.

The defendants offered the following prayer:

If the jury shall find from the evidence in this case, that the defendants entered upon the said demised premises in pursuance of the lease declared on, and which is in evidence, and shall further find, that they used and occupied the said premises, and that during said term or tenancy, and while the defendants were so in possession of said premises, they used the said building or warehouse as persons of ordinary care and prudence would have done looking to its character, size, apparent construction and strength, and that the said house fell down during said tenancy in consequence of some defect in the structure of the same, or on account of a

want of a proper thickness of the wall, or on account of inferior materials used, or on account of the ordinary decay of the materials used in the erection of said building, all of which was unknown to the defendants; and shall further find, that the same could not have been discovered by reasonable and ordinary diligence, then the plaintiffs are not entitled to recover in this action, and the verdict must be for the defendants.

The plaintiffs presented the following special exception to the prayer of the defendants:

The plaintiffs not waiving any other grounds of objection to the defendants' prayer, specially except thereto:

1. Because there is no evidence sufficient to sustain the hypothesis thereof:

2. Because there is no evidence that the parties mutually contemplated the use which the defendants actually made of the said building.

The Court (HARLAN, J.) refused the first, third, fifth and seventh prayers of the plaintiffs and granted their second, fourth and sixth prayers, and granted the prayer of the defendants. The plaintiffs excepted, and the verdict and judgment being against them appealed.

The cause was argued before MILLER, ROBINSON, IRVING, BRYAN, FOWLER, and McSHERRY, J.

*Arthur W. Machen,* and *Bernard Carter,* for the appellants.

That it was the object of the ninth paragraph or covenant of the lease relating to liability for damage or injury, to cover the entire subject-matter of responsibility for breakage of the building or any of its parts, is manifest; and if the full and careful provision so made against accidents does not include the present case, the intention expressed in it fails to be accomplished. What is there in the lease, or in the facts and circumstances, to prevent?

Machen and De Ford *vs*. Hooper.

The contention of the defendants is that there is another covenant, found in the latter part of the lease, for the surrender of the premises in good order at the end of the term, which contains an exception of ordinary wear and tear, and that this exception should be considered as incorporated also into the covenant now in question—the subject of the first three counts—and that the accident, if traceable to inherent defects in the building, or decay of timbers, may be held to be brought about by ordinary wear and tear, and so come within the exception.

Before there can be engrafted upon the covenant in the ninth paragraph of an exception not contained in it, because of the presence of such an exception in another covenant, it is at least, necessary to find some incompatibility between the two covenants, unless such an implication is indulged in. *Prima facie* each covenant, if its language is clear and unambiguous, expresses its own meaning. Both covenants are intended for the benefit of the landlords, and it is contrary to every reasonable principle of construction to qualify a plain and explicit stipulation of itself fully applicable to the case in question, unless the meaning so expressed therein is in *conflict* with the other and independent covenant, or unless the instrument, as an entirety, discloses an intent which will not be gratified without the interpolation in the covenant in question of such qualification, which its own words do not contain.

In *Baylis vs. LeGross*, 4 *C. B. N. S.*, 537, there was a general covenant by the lessee to repair, and in the same lease another covenant to repair within three months upon notice from the lessor; an ejectment being brought for a forfeiture by breach of the former covenant, the Court held it to be clear that the covenants were independent. COCKBURN, C. J., said: "These two covenants are quite separate and independent. The authorities are

all clear to that effect; and they coincide with the common sense of the thing. It would indeed be monstrous, if, giving credit to his tenant that he will duly perform his engagement, the landlord abstains from harassing him with continual inspection, and then should find himself debarred of his remedy for a breach of a positive covenant. I cannot entertain the slightest doubt that there has been a forfeiture here." And the other Judges were equally explicit.

In *Roe d. Goatly vs. Paine*, 2 *Camp.*, 520, affirmed in the last cited case, the landlord had given notice to repair under the covenant to repair within a given time, and before the expiration of the notice brought ejectment for forfeiture by breach of the general covenant to repair: Held that he was entitled to recover.

*Few vs. Perkins*, 36 *L. J. Exch.*, 54, is a recent decision upon the same point. In *Doe d. Morecraft vs. Meux, et al.*, 4 *B. & C.*, 606, where the *forfeiture* by breach of the general covenant to repair was held to be waived by the notice there given under the other covenant, it was not doubted that an action of *covenant* would lie on the former covenant pending the notice. BAYLEY, J., said: "The landlord in this case had an option to proceed on either covenant, and after giving notice to repair within three months, he might have brought an *action* against the defendant upon the former covenant for not keeping the premises in repair." 4 *B. & C.*, 609. And HOLROYD, J., made a like declaration. *Ib.*, 610. In the case of a covenant to repair, and to keep in repair during the term, an action will lie for a breach committed before the expiration of the term. *Luxmore vs. Robson*, 1 *B. & Ald.*, 584. And substantial damages are recoverable in the action brought during the term, notwithstanding the further obligation to keep the premises in repair and at the expiration of the term so to yield up the same. *Bell vs. Hayden*, 9 *Irish Law R.*, *N. S.*, 301, (1859.)

So, in cases of *waste* committed by a third party, but for which the lessee is legally responsible, although there is no negligence on his part, the action will lie during the term, notwithstanding a covenant that at the expiration of the term the tenant will surrender the premises in as good condition as the reasonable use thereof will permit. *Parrott vs. Barney,* 2 *Abbott, U. S.,* 197.

Where the tenant covenanted to repair, and also covenanted to insure the premises to a certain amount, and the premises were burnt down, it was held that his liability on the covenant to repair was not limited to the sum specified in the covenant for insurance. *Digby vs. Atkinson,* 4 *Camp.,* 275. "The covenant to insure was introduced for the security of the landlord, leaving the tenant still absolutely liable on the covenant to repair." Lord ELLENBOROUGH, *Ib.,* 278.

An exception of fire in a lessee's covenant to repair, will not exempt him from liability on a covenant to pay rent in which there is no such exception, although the premises have been burned down and the lessor has not rebuilt after notice. *Belfour vs. Weston,* 1 *T. R.,* 310.

Wherever there are several covenants in a lease, each standing distinct and complete in itself, they are to be held as distinct and independent. Thus, where the lessee covenanted to repair buildings and fences, and also covenanted to build during the term one hundred and twenty-five rods of fence, the two are independent, and a former action by the lessor upon the latter covenant was held to be no bar to a subsequent action on the covenant to repair. *McIntosh vs. Lown,* 49 *Barb.,* 550.

And in the case of *mutual* covenants between the parties, it is a general rule that the covenants are to be treated as independent rather than as conditions precedent. *Newson vs. Smythies,* 3 *H. & N.,* 840.

A leading case on this subject is *Hare vs. Groves,* 3 *Anstruther,* 687. The lease there contained a covenant

Machen and De .Ford *vs.* Hooper.

by the lessee to pay rent without any qualification, and another covenant on his part to repair, *damage by fire excepted;* it was held that the liability to pay rent upon the former covenant was not affected by the exception in the latter one. And the Chief Baron stated the *principle* which seems to have been accepted by the best authorities ever since: "I take the distinction to be this: where upon a covenant by one party, the law raises another mutual and correlative covenant, the one becoming impossible, the other also is gone. But where the covenants both arise out of the express agreements of the parties, *and are not described as dependent the one upon the other,* although the performance of the one becomes impossible, yet the force of the other remains. And this has been repeatedly decided in cases resembling the present. In *Dyer,* 33*a,* and in *Paradine vs. Jane, Aleyn's Rep.,* 26, it is ruled that where a lessee covenants to repair, destruction by lightning, or the King's enemies, does not excuse. So, in the case at bar, the lessee would not only have been obliged to pay rent in the event which has happened, but to repair also, if that were not expressly excepted." 3 *Anstruther,* 696, 697.

And in 2 *Platt on Leases,* 191, 192, the rule is thus stated conversely: "An exception against damage by fire in a covenant for payment of rent does not extend to the covenant to repair; for there is no *necessary* connection between the covenants."

*Moyer, et al. vs. Mitchell,* 53 *Md.,* 171, is a strong authority for the doctrine that each independent covenant is to be construed by its own terms, and that the contract of the covenantor is not to be qualified by exceptions or qualifications not expressed in it. See opinion of the Court, *Ib.,* 177, 178. See also, *Dermott vs. Jones,* 2 *Wall.,* 8; *Sheets vs. Selden,* 7 *Wall.,* 423; *White vs. Wagner,* 4 *H. & J.,* 566; *Smith vs. Compton,* 3 *Barn. & Adol.,* 189.

So, in enforcing performance of a *contract* for a lease, in chancery, the Court refused to introduce any exception to the lessee's covenant to repair which the contract did not specifically provide for. *Sharp vs. Milligan*, 23 *Beav.*, 419.

While the covenant to surrender in good condition at the end of the term has its own office to fulfil, it does not take the place of a covenant to repair. In *Warner vs. Hitchins*, 5 *Barbour, Sup. Ct.*, 668, the Court observed: "It is now, however, settled, that when the lease contains, on the part of the lessee, *an express covenant to uphold and repair* the premises, he is liable to make good such losses. [The reference was to accidental fires.] But in all the adjudicated cases, where this liabiity has been held to attach to the lessee, he has entered into an *express covenant to repair;* and in all those cases in which the same lease has also contained a covenant to surrender the premises in the same condition, or in as good condition, as at the commencement of the term, this covenant has not been noticed by the Court as important, but the covenant *to repair* has been made expressly the basis of recovery."

It seems to follow as an irresistible conclusion from these well-settled principles, that the covenant declared upon in the first count cannot be qualified by an exception not contained in it, although it is found in the independent covenant for the surrender of the premises at the end of the term. Each covenant has its appropriate function. There is nothing inconsistent in them.

But the very question presented in the present case has been directly adjudicated. *Kling vs. Dress*, 5 *Robertson, N. Y. Sup. Ct.*, 521, was a case where a lease contained two covenants on the part of the lessees, one to "*keep the premises in good repair, and do all necessary repairs on the buildings* at their own expense during the term," the other a covenant at the expiration of the term to "quit

and surrender the premises in as good state and con-dition *as reasonable use and wear thereof would permit, damage by the elements excepted."* The referee's report specified certain defects which he found in the building, but found that the building was in good repair, *except by reason of damages caused by the elements.* And he found for the defendants, dismissing the complaint of the les-sors. This judgment was reversed by the Court, and a new trial ordered.

The entire argument in behalf of the appellees assumes that the law, in the absence of express contract, imposes some duty or obligation on the lessor, with respect to the quality of the premises, or the reparation of them. But it is always to be borne in mind that a landlord is never under any obligation to repair, without an express agreement. *Gott vs. Gandy,* 2 *Ellis & Bl.,* 845; *Doupe vs. Genin,* 45 *N. Y.,* 123; *Kramer vs. Cook,* 7 *Gray,* 550; *Sheets vs. Selden,* 7 *Wallace,* 423; *Moyer, et al. vs. Mitch-ell,* 53 *Md.,* 176. Where the landlord does expressly contract, his liability is strictly limited by the terms of his covenant. *Leavitt vs. Fletcher,* 10 *Allen,* 121.

And there is never any implied warranty by the lessor of the fitness or sufficiency of the demised building, unless it is let *furnished. Bowe vs. Hunking,* 135 *Mass.,* 380; *Keates vs. Earl of Cadogan,* 10 *C. B.,* 591; *Hart vs. Windsor,* 12 *M. & W.,* 68; *Dutton, et al. vs. Gerrish,* 9 *Cush.,* 89; *Chappell vs. Gregory,* 34 *Beav.,* 250; *Viterbo vs. Friedlander,* 120 *U. S.,* 712.

It is clear that an express covenant to repair, contain-ing no exception of fire or act of God, will make the lessee liable for the consequences of either. *Taylor on Land. and Tenant, sec.* 364; *Platt on Covenants,* 274, 275.

As Lord KENYON said in *The Brecknock Co. vs. Pritch-ard, et al.,* 6 *T. R.,* 752, "the principle stated by the counsel for the plaintiffs, [*i. e.,* that when the party by his own contract creates a duty or charge upon himself,

he is bound to make it good if he may, notwithstanding any accident by inevitable necessity, because he might have provided against it by his contract], is the true one; if the defendants had chosen to except any loss of any kind, it should have been introduced into the contract by way of exception."

While the common law liability of the tenant would not make him responsible in damages for the consequences of a reasonable and prudent use of the premises, yet where he has entered into an *express* covenant on the subject, the language of that covenant must be regarded, and full effect given to it, and if any bias at all is to be indulged in, the rule of law requires that it shall be *against* the covenantor. *Manchester Bonded Warehouse Co. vs. Carr, L. R.,* 5 *C. P. D.,* 512 *and* 513; *Warde vs. Warde,* 16 *Beav.,* 105; *Platt on Covenants,* 274–6.

"A tenant who covenants to repair, is to sustain and uphold the premises." Lord TENTERDEN, C. J., *Auworth vs. Johnson,* 5 *Car. & Payne,* 241.

The construction which the defendants' counsel ask the Court to put upon the present covenant would render the covenant *nugatory;* for, according to their contention, it imposes no greater liability upon the tenants than the common law would have imposed without any express covenant.

It is worthy of notice that the lease contains no covenant whatever on the part of the lessors for the making of repairs—not even repairs of the exterior. The only obligation they assume is to apply insurance money when received, to the restoration of damage done by fire. On the other hand, the covenant entered into by the lessees is express and positive, and stated in the most precise way, declaring, in the first place, what damage they *shall* be responsible for, and secondly, by careful repetition, defining, conversely, all the things they shall *not* be responsible for.

There is no implied warranty by the lessor of an unfurnished building that the building is fit for the purpose for which it was to be used. *Manchester Bonded Warehouse Co. vs. Carr*, L. R., 5 C. P. D., 510; *Naumberg vs. Young*, 15 *Vroom*, N. J., 344.

There is no implied contract by the lessor that the house shall endure for the term. *Arden vs. Pullen*, 10 *M. & W.*, 321.

*Thomas M. Lanahan*, and *Charles Marshall*, for the appellees.

BRYAN, J., delivered the opinion of the Court.

The questions in this case were presented to the Court below with a considerable variety of form. They all depend, however, upon the proper construction of the agreements contained in a certain lease, which appears at large in the record. On the sixth day of June, eighteen hundred and seventy-nine, the plaintiffs below (now appellants) leased to the defendants a lot of ground in the City of Baltimore "together with the building or warehouse thereon;" said lot and building being known as number 37 South Gay street. The lease was for the term of five years, accounting from the fifteenth day of May, eighteen hundred and eighty. Shortly after the execution of the lease, the lessees obtained an assignment from a tenant in possession and entered upon the premises. On the thirtieth day of May, eighteen hundred and eighty-four, the building suddenly fell down and became a mass of ruins. It was contended at the trial below that by force of the agreements contained in the lease, the defendants were responsible for the damage caused by the disaster; while the contrary was maintained by the defendants. Before we examine the terms of the lease, we will state some of the evidence adduced by the respective parties. The evidence offered on the

part of the plaintiffs tended to show that the building was five stories high; that it was erected in 1854, by a skillful and experienced builder for the firm of Charles D. De Ford and Co.; that it was constructed of the best materials and was a structure of the strongest kind; that the firm were largely engaged in manufacturing tobacco and that they stored a large quantity of tobacco in it, and required a very strongly built house for their business; and that its fall was caused by storing in it a large quantity of cotton goods of excessive weight. The evidence offered in behalf of the defendants tended to show that the defendants were manufacturers of cotton duck, cotton twine and cotton rope; that they were 'well known to one of the plaintiffs; that the warehouse was badly constructed; that it was built of inferior materials and was weak; that the defects in the building could not have been discovered without a thorough examination by an architect or other expert conversant with such matters; that if the walls had been of proper thickness and the materials had been sound and good and of proper strength, four million six hundred and three thousand five hundred pounds might have been stored in it with safety; that on the day when it fell the goods stored in it and in an adjoining warehouse weighed one million eight hundred and seventy-eight thousand eight hundred and sixty-five pounds, including what was in the cellars, and that they were properly stored; and that the cause of the fall of the building was its weakness. It will be seen that there was a very great conflict in the evidence. Of course the Court could not determine the truth of the testimony; but could only give the jury instructions on the law adapted to such conclusions as they might draw in respect to the credibility· of the evidence. They were instructed according to the second prayer of the plaintiffs, that if the fall of the building was attributed to alterations made

in the building by the defendants in connection with the use thereafter made of it by them, the plaintiffs were entitled to recover. And according to their fourth prayer, that if the fall was owing to the excessive quantity of goods stored in the building by the defendants, or to the manner in which they were stored, the plaintiffs were entitled to recover. And in their sixth prayer that the burden of proof was upon the defendants to show that the building fell in consequence of ordinary wear and tear, and that unless they did show that the fall of the building was so caused, the verdict should be for the plaintiffs. The jury were also instructed on the prayer of the defendants, that if they used the building as persons of ordinary care and prudence would have done, looking to its character, size, apparent construction and strength, and that it fell down in consequence of some defect in its structure, or on account of a want of proper thickness of the wall, or on account of the ordinary decay of the materials, and that all these matters were unknown to the defendants, and could not have been discovered by reasonable and ordinary diligence, the verdict should be for the defendants. Other instructions were prayed by the plaintiffs, which we shall consider in another part of this opinion. But we shall first examine the lease and see how far these instructions were justified by its provisions.

The lease is very long, and is drawn with much minuteness and particularity. The agreements contained in it are called covenants; but as the instrument is not under seal, this description is not technically accurate. It was probably adopted under the supposition that it was to be sealed by the contracting parties. This phraseology, however, will not in any way affect the construction of the paper. After stating the lease of the lot with the building or warehouse thereon, many so-called covenants follow. There is a provision for a suspension of the

Machen and De Ford *vs.* Hooper.

rent in case of destruction by fire, or by the act of God; or by anything done or occurring without the fault of the lessees; and for a rebuilding at the expense of the lessors under certain circumstances not now necessary to be particularly noticed. There was an agreement that the lessees might at their own expense make alterations in the building which should not affect its safety or strength and durability. The lessees covenanted in these words "that they would be liable and answerable for any and all damage or injury other than loss or damage by fire not suffered by breach of any covenant herein contained on the part of the parties of third part (the lessees,) to be performed, which, during their occupation thereof, shall occur to the said building or any part thereof, by or by reason of any act or thing done or occurring within said premises or building, and also for any act or thing done or occurring outside thereof by the said parties of the third part, their servants, employés or tenants, or otherwise by their authority or consent, but shall not be responsible for damage by fire, unless not covered or protected by insurance, by failure on their part to comply with some of the stipulations or covenants of these presents nor by act of God, or act or acts of third persons done or committed outside of the said demised premises without the participation, authority or consent of the lessees." And in a subsequent part of the lease they covenanted that at the end of the term they would quietly surrender to the lessors "the said demised premises and building in the same good order and condition they now are in, ordinary wear and tear, loss by fire, (other than as hereinabove specially provided against,) act of God, and damage caused by external accident or acts of third parties, as hereinbefore particularly mentioned, together with the addition and improvements by the said parties of the third part thereto, or therein added or made, in good order as aforesaid,

unless such addition shall have been required by the lessors or their assigns to be removed under the succeeding covenant.'' And the lessees further covenanted that if required by the lessors they would restore the building to the same state and condition in which it then was, ordinary wear and tear excepted. A view of the circumstances connected with the making of this lease will materially assist us in ascertaining the meaning of the contracting parties. The lessors owned a warehouse which they desired to rent; it was large and commodious and was believed to be of uncommon strength. The lessors certainly so believed and it would be a very irrational inference from any evidence in the cause to infer that the lessees did not believe the same thing. The lessees desired for the prosecution of their business, just such a warehouse as this one was supposed to be. They required one of great strength and great storage capacity. The lessors wished good tenants who would pay the rent promptly, and would take good care of the building; who would not inflict any injury upon it, and who in using it for the purposes of their business, would exercise the care and prudence which reasonable and just persons ought to exercise. It was natural that the lessees should accede to these expectations. But it was not in the contemplation of either of the parties that the building would fall from its inherent weakness, or from its defective construction. If the lessees had believed that such a result was probable, every instinct of reason and common prudence would have prevented them from leasing it. And it would have been very far from the ordinary course of business pursued by all men, whether wise or foolish, to enter into a contract to rebuild it, in case it should fall without any default, negligence or want of care on their part. Yet still it was in their power to enter into any contract, which they saw fit to make; and if they have agreed to become responsible for a disaster aris-

Machen and De Ford *vs.* Hooper. ·

ing from defects in the building, they must abide the con-
sequences.   In determining, however, what was meant by
their contract, we must take within the compass of our
view the circumstances which we have mentioned.   They
have agreed in the words of the lease to be answerable for
all damage or injury (with certain exceptions,) which
should "occur to the building by reason of any act or
thing done or occurring within said premises or building,
and also for any act or thing done or occurring out-
side thereof" by themselves or their servants or their
tenants.   If. the words "by themselves or their servants
or their tenants" are to be applied to the things done
within the premises or building, as well as those done
outside of them, the liability of the lessees is limited
to their own conduct.   But if these words are to be
restricted to the things done outside of the premises,
then the lessees are liable for any injury which might
occur (with the exceptions named) although it might
be without their agency, and beyond their power to
prevent it.   It is far more reasonable to infer that they
contracted to make good any damage which they them-
selves should cause ; than that they agreed to incur an
indefinite liability, which might arise from causes over
which they could have no control.   The other clauses
in the lease are in harmony with this construction.
One of these clauses bound them to restore the prem-
ises in the same order in which they received them
"ordinary wear and tear excepted."   If the building
fell in consequence of its defects, this loss·would be
from ordinary wear and tear, according to the authority
of *Hess vs. Newcomer and Emmert,* 7 *Md.,* 325.   It is
difficult to understand the significance of the stipula-
tion that the lessees are not to be responsible for ordi-
nary wear and tear, if they are to be held liable in case
it should tumble down because it was not sufficiently
strong to stand.   It would be a denial of the meaning of

the words "wear and tear," and would involve a contradiction in terms. To understand the meaning of this document, we must consider the whole of it as descriptive of one transaction, and we must ascertain its interpretation by considering the condition of things in which it had its origin. The examination which we have made of the lease satisfies us that the instructions given by the Court placed the case properly before the jury. The plaintiffs' first prayer maintained that the defendants were responsible for any and all loss which should occur to the building, unless caused by fire; not even excepting injury arising from imperfect construction, or from the use of inferior materials, in the work, and even although the defendants might have observed the utmost care, prudence and circumspection in their use of the building. The third prayer asserted that the burden of proof was on the defendants to satisfy the jury that the alterations made in the building did not contribute to its fall. The alterations were made by authority granted in the lease. It is not to be assumed *prima facie* that they were improperly made. The matter was susceptible of proof; and the averment that they were improperly made ought to be proved by the party making the charge. The plaintiffs' fifth prayer is in these words: "That there is no evidence that the building in question was let to be used for heavy storage purposes, or any other particular use, and if the jury find that the defendants entered and occupied the same under the lease in evidence, and made the alterations they desired as mentioned in the evidence, and afterwards used the building for the storage of heavy goods, it was incumbent on them to ascertain, as far as practicable, the limits of the capability of the building to bear the weights they, from time to time, proposed to put upon it, and for that purpose to obtain, if necessary, the aid of persons skilled in such matters." The jury had

Machen and De Ford *vs.* Hooper.

a right to consider the purpose for which the warehouse was built, and for which it had been used, and also its apparent strength and storage capacity; and the business in which the defendants were engaged when they rented it; and to find whether, as men of ordinary prudence and sagacity, they were justified in believing that it was strong enough to bear the weight of the goods which they stored in it. It is not in the ordinary course of business to require tenants to make the examination mentioned in this prayer. The defendants rented the warehouse for the prosecution of their business; they and their business were known to one of the plaintiffs, and it must have been known that they intended to use the warehouse for such proper purposes as their business required. The plaintiffs' seventh prayer proceeds on the theory that if the building fell because of the weight of the goods stored in it, or of the manner in which they were stored, the defendants were liable. It does not leave to the jury the inquiry whether the weight of the goods was unreasonable and excessive, or whether they were stored in a cautious, prudent and skilful manner. These inquiries were indispensable, unless the defendants are to be understood as contracting that they would abstain from a reasonable use of the building for the purposes to which it was apparently adapted. There must be some limitation to their liability for injuries caused by their own act. If a warehouse, to all appearance strong and stable, should in reality be so infirm as to fall down when the most ordinary operations of business are going on with care and prudence within its walls, it would not be just to say that the fall was caused by the tenant's conduct. Before we can convict the tenant of inflicting such an injury, we must find that he did something which he ought not to have done; that he subjected the building to an unreasonable strain, or that he was in some other way negligent, incautious or

Machen and De Ford *vs.* Hooper.

regardless of duty. If a building should fall because it was too weak to endure legitimate use, it could not with propriety be said that the injury was inflicted by a tenant who was prudently and carefully making such legitimate use of it. These four prayers which we have just mentioned were all properly rejected. The demurrers presented substantially the same questions as those decided in the prayers.

This case is very interesting, and it has been remarkably well argued on both sides. We have fully recognized the force of the arguments addressed to us by the learned counsel for the appellants, and the weight of the authorities on which they relied. We think, however, that the decisive character of several of the cases which they cited has been greatly diminished by a change which has been silently and steadily taking place in the mode of construing contracts. In *Kingston vs. Preston*, 2 *Doug.*, 689, Lord MANSFIELD made a vigorous protest against the artificial and mechanical rules of construction which prevailed at that time, and earnestly insisted that the "evident sense and 'meaning of the parties" was the true object of inquiry by the Court, without regard to the order or arrangement of the covenants. Many distinguished jurists since his Lordship's time have given their efforts to the establishment of this rational principle. A summary of the doctrine as generally adopted may be found in *Platt on Covenants*, (3 *Law Library*, 136:) "The first general principle is that covenants shall be so expounded as to carry into effect the intention of the parties. This intention is not to be collected from the language of a single clause in the deed, but from the entire context; and it is immaterial in what part of a deed any particular covenant may be inserted, for exposition must be upon the whole instrument, *ex antecedentibus et consequentibus*, and according to the reasonable sense and construction of the words;

as is said by Plowden : 'The scope and end of every
matter is principally to be considered; and if the scope
and end of the matter be satisfied, then is the matter
itself, and the intent thereof, also accomplished.' *Reni-
ger vs. Fogossa,* 1 *Plow.*, 18.   So observes Lord HOBART:
'The law, being to judge of an act, deed, or bargain,
consisting of divers parts, containing the will and intent
of the parties, all tending to one end, doth judge of the
whole, and gives every part his office to make up that
intent, and doth not break the words in pieces.' *Earl
of Clanrickard's Case, Hobart,* 275, 277.   This principle
of construction is also agreeable to a rule in the civil
law, viz., if the words of a covenant appear to be con-
trary to the intention of the covenantors, which is other-
wise evident, such intention must be followed rather
than the words.   Accordingly in many cases, the most
general words in a deed have been holden to be narrowed
and restrained by the apparent object and intent of the
parties, as collected from other parts of the same deed.
Thus in *Broughton vs. Conway, Moore,* 58, in debt on
obligation, with this condition, (after reciting that the
defendant had sold to the plaintiff a lease for years of
the manor of S.,) that he would not do, nor had done,
any act to disturb the plaintiff's possession of it, but
that the plaintiff should hold and enjoy this peaceably
without the disturbance of the defendant or any other
person; it was holden by all the Justices that the defend-
ant was not bound to warrant peaceable possession to the
vendee, but only against acts done or to be done, by him-
self; and that all the sequel of the condition which came
after the word *but* should be referred to the antecedent
part of the condition, and expounded and extended in
like manner; that is to say, that he should enjoy it with-
out disturbance of any person or persons, by any act by
him done, or to be done." Certainly this rule of con-
struction prevails in this State to the fullest extent.   In

very many cases it has been tacitly applied as a matter of course, without formal enunciation. Our decisions have been in full accord with the rule stated by the Supreme Court of the United States in *Nash vs. Towne,* 5 *Wallace,* 699. It may answer a good purpose if we quote it. "Courts, in the construction of contracts, look to the language employed, the subject-matter, and the surrounding circumstances. They are never shut out from the same light which the parties enjoyed when the contract was executed, and, in that view, they are entitled to place themselves in the same situation as the parties who made the contract, so as to view the circumstances as they viewed them, and so to judge of the meaning of the words and of the correct application of the language to the things described."

There is no error, and the judgment will be affirmed.

*Judgment affirmed.*

(Decided 16th January, 1891.)