## WARREN *v.* STODDART.

1. Where a party, entitled to the benefit of a contract, can, at a trifling expense and with reasonable exertions, save himself from a loss arising from a breach of it, it is his duty to do so. and he can charge delinquents only with such damages as with reasonable endeavor he could not prevent.

2. The contract between the parties (*infra*, p. 225) construed. *Held*, that W. having put an end to it by canvassing on behalf of another party for a rival edition of the same work, and cancelling the orders he had obtained for S.'s reprint, S. was not bound thereafter to furnish him with copies of the work on credit.

ERROR to the Circuit Court of the United States for the Northern District of Illinois.

Joseph M. Stoddart was a book publisher, carrying on business in the city of Philadelphia, under the name of J. M. Stoddart & Co. In 1878 he undertook to reprint and sell in the United States a new edition, consisting of twenty-one volumes, of the Encyclopædia Britannica, which A. & C. Black, of Edinburgh, Scotland, were then bringing out.

His plan was to sell the work by subscription only; the subscriptions were to be obtained by agents and canvassers, to whom certain territory was to be allotted. It was expected

that the work would be printed and published at the rate of about three volumes per year.

Moses Warren was an agent in the city of Chicago for the sale of subscription books; that is, books sold only by subscription. On Feb. 24, 1877, he and Stoddart entered into a contract in writing, which is as follows:—

"Philadelphia, Feb. 24, 1877.

"Agreement entered into this day between J. M. Stoddart & Co., of Philadelphia, Pa., and Moses Warren, of Chicago, Ill.

"The said J. M. Stoddart & Co. agree to give the said Moses Warren a general agency for the sale of the American reprint of the Encyclopædia Britannica in the following territory."

Here follows a description of the territory, consisting of several States and parts of States, and a list of the prices at which Stoddart & Co. agreed to furnish Warren with the books in various styles of binding. The contract then proceeds:—

"Said J. M. Stoddart & Co. also agree to give to said Moses Warren the exclusive right to sell the Encyclopædia Britannica within the above-named territory, during such time as said Warren shall faithfully perform his part of the agreement as hereinafter stated.

"1st, Said Warren agrees to use his best endeavors to promote the sale of the　Britannica in the above-assigned field.

"2d, To send to J. M. Stoddart & Co. a weekly report of the number of orders taken the week previous.

"3d, To fill no orders outside of his assigned field.

"4th, To leave no volumes with booksellers to sell or display in their stores.

"5th, To furnish no volumes at less than the regular retail price.

"6th, To remit on the 7th day of the month one-half the amount of monthly statement for previous month, and to remit on the 26th day of the month the remaining one-half of said monthly statement.

"Witness our hands and seals on the day and date above mentioned.

"J. M. Stoddart & Co.　[seal.]
"Moses Warren."　　[seal.]

Warren at once entered upon the performance of this contract, and by April 20, 1878, had obtained and reported to Stoddart subscriptions for 1,733 sets of the work, and had de-

livered to subscribers a portion of the volumes of the work which had been issued up to that time; on an average less than four volumes to each subscriber.

In the latter part of the year 1877 or early in 1878 the Scotch publishers of the Encyclopædia and the house of Scribner & Armstrong, of New York, formed a plan to issue in this country an edition of the Encyclopædia, to compete with the reprint of Stoddart, by striking off sheets from the original stereotype plates and engravings of the Scotch edition and sending them to this country to be bound and sold by subscription, on substantially the same plan as that which had been adopted by Stoddart to put his reprint into circulation.

Sometime in May, 1878, Scribner & Armstrong commenced negotiations with Warren, which resulted in a contract between them, dated May 14, 1878, by which they constituted him their agent, with the exclusive right to sell, until its publication was completed, their edition of the Encyclopædia within the same territory substantially as that mentioned in the contract between Stoddart and Warren, and agreed to furnish him with copies of the Encyclopædia at prices therein named. He stipulated on his part that from and after the date of the contract he would not canvass for any other Encyclopædia, or any other edition of any Encyclopædia, but that he " should have the privilege of completing orders already taken for the reprint edition of Stoddart to all subscribers therefor."

After the making of this contract Warren refused to canvass further for Stoddart's reprint edition. Whereupon Stoddart refused to furnish him, except for cash on delivery, the books with which to fill the orders which he had obtained for Stoddart's reprint edition.

Upon this point the evidence was as follows: On June 5, 1878, Warren sent an order to Stoddart requesting him to forward a certain number of books to be furnished subscribers, to which Stoddart replied by letter, dated June 6, 1878, that " as to all future orders, for the present they will be filled when cash accompanies the orders."

On June 10, 1878, Warren wrote to Stoddart as follows : " I am desirous of delivering reprint fast as possible on my orders heretofore taken for same. If my orders for stock are filled

they shall be paid for according to contract. Do you intend to fill my orders on that basis?"

To this letter Stoddart replied by telegraph as follows: " Will fill order when cash is received in accordance with our letter of June 6." There is no evidence that Stoddart ever refused to fill a cash order; nor was it pretended that Warren, after that date, ever sent an order to Stoddart with the cash to pay for the books ordered.

After the refusal of Stoddart to supply Warren with the books except for cash, the latter induced 1,253 of the subscribers to Stoddart's reprint edition to exchange the subscription to the reprint for a subscription to the Scotch edition, and he claimed that he expended in obtaining their exchange an average of four dollars for each subscription, making a total of $5,012. He also claimed that the Stoddart reprint volumes taken back from said subscribers were worth $12,206 less than the amount paid by him to Stoddart for them, and less than what he could sell them for in the market. Warren also claimed that he lost his profits on four hundred and eighty orders which were not exchanged, amounting to the sum of $20,073.

This suit was brought by Stoddart to recover of Warren the sum of $2,976.53 for books furnished him to supply his subscribers. It was not disputed by Warren that the amount sued for was due and owing from him to Stoddart. But Warren, by way of set-off, averred the making of the contract with Stoddart above set forth, and claimed that he had been damaged by the refusal of Stoddart to perform the contract, in the sum of $30,000.

Upon the trial of the case, the judge instructed the jury that the defendant's claim for damages could not be allowed as against the plaintiff's claim in the suit, and that the plaintiff was entitled to a verdict for the full amount sued for by him and admitted to be due; namely, $2,976.53. The jury returned a verdict accordingly, on which judgment was entered. This writ of error is prosecuted by Warren to reverse that judgment.

*Mr. Van H. Higgins* and *Mr. Isaac N. Arnold* for the plaintiff in error.

There was no opposing counsel.

MR. JUSTICE WOODS, after stating the case, delivered the opinion of the court.

The only question in the case is whether or not the instruction of the court to the jury, to the effect that, on the facts, the plaintiff in error was entitled to no damages, is correct. This will depend upon the construction which is to be put on the contract between Stoddart and Warren, of Feb. 24, 1877.

The contract is indefinite as to the time during which it was to continue in force. It is probable that the parties supposed the contract would continue until the twenty-one volumes were published, or at least until the territory named in the contract had been thoroughly canvassed. But no time was mentioned in the contract, nor did it make any provision with respect to the unfilled orders in case of its termination before the publication was completed, and we are left to construe it and settle the rights of the parties under it as they have made it.

The complaint of Warren is not that Stoddart refused to furnish him with the books necessary to fill the orders he had taken, nor that he refused to furnish the books at the price fixed by their contract. His sole complaint is that Stoddart refused to furnish the books on a credit of about thirty days, which Warren insists the contract provided for, and demanded the cash.

He claims that after he had stopped canvassing for the reprint of Stoddart, and had made a contract with and entered into the service of a rival publisher of the same work, and had begun in the interest of the rival publisher a canvass of the same territory which had been allotted to him exclusively by his contract with Stoddart, he had the right, upon the refusal of the latter to furnish the books on thirty days' credit, to obtain a cancellation of the orders he had taken for Stoddart's reprint, and substitute therefor orders for the rival edition, and charge the expense of the substitution to Stoddart.

We think it entirely clear that he had no such right. There was no express provision in the contract between Warren and Stoddart which required the latter to furnish the books on credit, and we think that the provision of the contract that

Warren should remit on the seventh day of the month one-half the amount of monthly statement for previous month, and on the twenty-sixth day the remaining half, was not continued in force after Warren had terminated the contract and abandoned the service of Stoddart under it.

Although the contract fixed no time during which it was to continue in force, yet we think when either party terminated it, the other was no longer bound by its provisions. It gave Warren the exclusive right to sell the books within certain territory, and by it Stoddart agreed to furnish them to him at stipulated prices and on stipulated terms. On his part Warren agreed to use his best endeavors to promote the sale of the work in the field exclusively assigned to him. These clauses of the contract were reciprocal, and the performance of one was the consideration for the performance of the other. When Warren ceased to canvass for Stoddart's books, he had no right to demand the books at the prices or the terms mentioned in the contract.

But even conceding that the provision referred to remained in force after Warren had declined to go on under the contract, it does not follow that, upon the refusal of Stoddart to give Warren a credit of thirty days upon the books, the latter could obtain a cancellation of the orders he had taken for Stoddart's reprint and substitute orders for the Scotch edition, and charge the expense of so doing to Stoddart. The claim that upon a simple refusal of Stoddart to allow him a thirty days' credit upon the books as he ordered them, he could go on and substitute other orders for another book and charge Stoddart with the expense of substitution, amounting to $30,000, is, to say the least, a remarkable one. The damage sustained by Warren because he did not get the thirty days' credit which he thinks he was entitled to is not to be measured in that way.

The rule is, that where a party is entitled to the benefit of a contract, and can save himself from a loss arising from a breach of it at a trifling expense or with reasonable exertions, it is his duty to do it, and he can charge the delinquent with such damages only as with reasonable endeavors and expense he could not prevent. *Wicker* v. *Hoppock*, 6 Wall. 94; *Miller* v. *Mariners' Church*, 7 Me. 51; *Russell* v. *Butterfield*, 21 Wend.

(N. Y.) 300; *United States v. Burnham*, 1 Mason, 57; *Taylor v. Read*, 4 Paige (N. Y.), 561.

The course pursued by Warren was not necessary to his own protection. He might either have paid Stoddart cash for the books required to fill his orders, or have allowed Stoddart to fill the orders and divide the profits of the business between them, on equitable terms. The law required him to take that course by which he could secure himself with the least damage to the defendant in error. Instead of this he unnecessarily destroys a valuable interest of Stoddart in the business in which they were jointly engaged, and then seeks to charge him with the great expense and damage which he brought on himself in so doing.

If Stoddart violated his contract with Warren in refusing to fill his orders except for cash, the measure of Warren's damages would be the interest for thirty days on the amount of cash paid on his orders. As no proof was given to show that Warren had ever paid cash for any books ordered by him, he would only be entitled, in any view of the case, to nominal damages.

But, as we have already said, Stoddart was not bound by the contract to furnish the books on credit after Warren had gone over to a rival publisher and refused to go on under his contract. We think, therefore, that the court below was right in saying to the jury that Warren was entitled to no damages at all.

*Judgment affirmed.*