Howry, J.,
delivered the opinion of the court:
Plaintiff sues to recover damages for the breach of a contract alleged to have been made between him and the defendants for the delivery by the plaintiff to the mint of the United States at Philadelphia of -125,000 pounds of ingot copper.
It sufficiently appears that about the 2d day of May, 1892, the superintendent of the mint at Philadelphia, Pa., published an advertisement inviting proposals for a quantity of supplies for use at the mint upon delivery, the advertisement, among- *5 other things, calling for ingot copper for alloy of satisfactory quality in the quantity stated, and for 15,000 pounds of bertha spelter. Proposals were required to be accompanied by a bond in the sum of $2,000 with one or more satisfactory sureties. Plaintiff offered to supply the copper of satisfactory quality and quantity, at 11.64 cents per pound, and the required amount of spelter, at 8.20 cents per pound, making delivery at the Philadelphia mint free of charge within the-time set forth in the' advertised proposals, “subject to usual terms and conditions.” Under date of July 2, 1892, plaintiff was informed in a letter signed by the chief clerk of the mint that his offer for the- delivery of the copper and the spelter for the fiscal year ending June 30, 1893, was accepted. No bond was asked of the plaintiff and none was offered or given by him. The spelter was delivered and paid for, but as the use to which the ingot copper was advertised for related to the coinage of silver, orders were issued by the Secretary of • the Treasury to the various mints of the country to stop the coinage of standard dollars, in consequence of which the defendants declined to receive the copper agreed to be delivered.
Upon notice to the authorities at the mint that he was ready to ship the copper according to contract, plaintiff received a communication, of which the following is a copy, to wit:
“The MiNt of the United States at Philadelphia,
Superintendent’s Office,
January 7, 1893.
“J. FriedeNSTEIN, New York City:
“Dear Sir: Referring to your inquiry relative to ingot copper, 1 have to say that, owing to the suspension of coinage of standard dollars, we use very little ingot copper now, and have 7,000 pounds on hand. It will, therefore, be impracticable to order copper with so great a quantity in stock.
- “Should Congress order resumption of dollar coinage we should have to order more copper.
“We have used only 3,000 pounds since February, 1892.
“Respectfully, yours,
“O. S. Bosbyshell.”
Other correspondence followed plaintiff’s inquiries to know when he should make the delivery and why he had not been permitted to do so, but it does not seem material to set out *6 these inquiries in detail nor the answers elicited in response to them.
No efforts were made by plaintiff to sell any ingot copper until after the close of the fiscal year ending June 30, 1893, and copper purchased about the beginning of the fiscal year could only be sold at a loss. The price of copper was greater after the letter in January, 1893, until late in March of that year than it was on the 2d day of July of the preceding year, and if plaintiff, having any copper on hand, had sold it during the month of March, 1893, he could have realized even a greater price than that for which he offered it to the mint.
Plaintiff asks judgment for the difference in the value of copper at the time his bid was accepted and the price in July and August, 1893 (after the contract period), while the defendants contend that no valid contract existed between the parties, because 'the chief clerk of the mint was without authority to make a contract for the Government, but that even if the letter of the chief clerk accepting plaintiff’s bid completed a valid contract, neither the superintendent nor any officer of the mint under him had authority to buj^ copper, because coinage of standard dollars had been abandoned, and with a large supply of copper still on hand the item for more was contrary to orders. But, aside from all this, plaintiff’s failure- to give the bond required by the advertisement for proposals was such an omission, it is further contended, that the mere acceptance of the proposal for delivery of the copper did not constitute a contract. It is further insisted by the defendants that plaintiff had no copper at any time with which to fill any contract, and if any valid agreement existed between the parties plaintiff was acting as agent for other persons, or, contrary to the provisions of section 3737 of the Revised Statutes, had assigned such contract as he had to others.
None of these defenses to the action are available. It must be presumed in the absence of proof to the contrary that the chief clerk accepted plaintiff’s offer with the consent and by the direction of the superintendent of the mint. Coinage had not been discontinued either by operation of law or by orders from the Secretary of the Treasury at the time of the publication requesting proposals for copper, and even if such had *7 been the case or the copper had not been needed the defendants could not escape responsibility from their contract to be supplied with something agreed to be taken, even though not actually needed at the time. Plaintiff’s failure to meet the conditions of the advertisement in the matter of the bond was sufficient to cause the rejection of his offer if the defendants saw fit to do so, but the acceptance of his bid and the receipt of some of the goods agreed to be delivered by plaintiff under it was a waiver of the requirement of the advertisement relating to the bond. No statute has been pointed out making the execution and delivery of the bond with satisfactory sureties necessary in contracts between the Government and individuals, and we are unable to find anything in the acts relating to public contracts or elsewhere which makes the giving of a-bond essential to the validity of contracts for the delivery to the Government of supplies proposed to be furnished. The taking of bonds for the purposes mentioned is usual and proper, but the practice of doing so in cases like that before us would seem to depend upon regulations of the Treasury Department rather than any positive enactment, and when waived by the Treasury can not be pleaded against contracts made by the Department.
If the contract was good for the delivery of the spelter it was also good for the delivery of the copper. The obligation off the agreement could not be so divided as to impose liability upon the plaintiff to deliver one article and not the other. Plaintiff delivered the spelter under the defendants’ agreement to receive it and payment was made to him b}r the defendants after the Government had received the benefit of the article. Being an indivisible agreement, the contract must be held valid and binding for the delivery of everything agreed to be delivered and received.
The doubt thrown upon plaintiff having the ownership of any copper to sell can not be considered. If the parties contracted for plaintiff to deliver copper at a fixed price, the measure of plaintiff’s obligation to do so was not determinable by his ownership or want of ownership of the required quantity as of the time of the contract. Delivery was necessary until the contract was broken or fulfilled irrespective of the possession by the plaintiff of the copper itself.
*8 The letter of January 7, 1893, from the superintendent of the mint to the plaintiff can not be considered as actually terminating the contract as of that date. The coinage of standard dollars had been suspended, it is true, and but little hope existed at that time for its resumption. But as plaintiff had a contract of some value to him, doubtless, and one which by its terms did not expire until the close of the fiscal year, it was optional with him to hold to whatever opportunities the contract afforded him to make something, as long as there was any reasonable expectation for him to be called on to supply the article which carried the profit to him. The letter of the superintendent left open the possibility of the resumption of dollar coinage and the need of some copper, by the action of Congress then in session.
But Congress adjourned March- 4, 1893, without ordering the resumption of coinage of standard dollars, and with no extra session or prospect for one during the fiscal year ending June 30, 1893, the notice was sufficiently explicit to plaintiff that upon the adjournment of Congress in March of that year the policy of the Secretary in suspending the coinage would be continued, and no copper more than that on hand would be needed within the fiscal year. It then became plaintiff’s duty to sell such copper as he had on hand (if he had any) within a reasonable time if he expected to hold the Government liable for damages for breach of contract. We think the breach fairly dated from that time.
But plaintiff took no action, made no effort to save himself from loss, retained presumably whatever copper he had on hand until the price went down, and then brought suit.
The rule is that where a party is entitled to the benefit of a contract and can save himself from a loss arising from a breach of it at a trifling expense or with reasonable exertions, it is his duty to do it. (Warren v. Stoddart, 105 U. S. R., 224, and authorities there cited.)
The measure of damages for the refusal of a purchaser to receive a commodity under a contract of sale is the difference between the contract price and the market price at the time and place of the breach of the contract. (Murray v. Doud, 47 N. E., 717; 167 Ill., 368; 63 lb. App., 247; Dill v. Mumford, 49 N. E., 861.)
*9 If at the time of tbe breach of contract the goods are worth in the market the full contract price, the vendor can not hold them until the price falls and then charge the other party with the loss. (Guy's Case, 25 C. Cls. R., 61.)
The delinquent can only be charged with such damages as with reasonable endeavors and expense he could not prevent. (Wicker v. Hoppock, 6 Wall., U. S. R., 94; Warren v. Stoddard, 224, supra.)
Where a right has been violated and no actual injury disclosed, it is usual to allow nominal damages. This general rule probably had its origin in the reason of the law to give something even where technical rights were involved, and in modern practice the essential object has been to award enough to cover costs. In this court, however, costs are not taxed. Under these circumstances it would be a departure from the ordinary practice of the court to give plaintiff a judgment for anything. {Grant's Case, T Wall., 331.)
The petition is dismissed.
Nott, Ch. J., was not present at the hearing of this case and took no part in its decision.