## WESTERN UNION TELEGRAPH COMPANY *v.* IVY.

### Opinion delivered January 1, 1912.

1. DAMAGES—DUTY OF INJURED PARTY TO PREVENT.—The principle that the injured party must reasonably exert himself to prevent damage applies to cases arising out of tort as well as those arising out of contract. (Page 251.)

2. TELEGRAPH COMPANY—DUTY TO MITIGATE DAMAGES.—Where the sender of a telegram had an opportunity to secure the information desired by answering a telephone call from the addressee, and refused to do so, he can recover only nominal damages for the negligent nondelivery of the telegram.   (Page 251.)

Appeal from Pulaski Circuit Court;   *F. Guy Fulk*, Judge; reversed.

STATEMENT BY THE COURT.

This is a suit for damages growing out of the failure to deliver the following telegram:

"Hot Springs, Ark., August 30, 1907.

"E. V. St. Clair, Terre Haute, Indiana.  Ship body of Leo Ivy to Traskwood, Arkansas.  Thirty dollars for expenses. H. McCafferty, Undertaker."

Leo Ivy was the fifteen-year old son of the appellee, by his former wife, and for whom he had a very great affection. The boy died in Terre Haute suddenly, and the first information his father had of his death came from a report of it to him by a neighbor to whom it was telephoned.  She could not remember the name of the undertaker, who had the remains in possession in Terre Haute, but thought it was Hickman.  Appellee, greatly desiring to have the body of his son interred in the family burying grounds, near Traskwood, and prevent its burial in the potter's field in Terre Haute, among paupers and strangers, endeavored to communicate with the undertaker in

charge of the remains, who was E. V. Sinclair.   He called Hick-
man, an undertaker in Terre Haute, over the long distance
'phone, who informed him that he did not have the remains
and asked if he should get them.   Appellee told him "No,"
that he would communicate with the undertaker who had them
in possession.   He then consulted McCafferty, the undertaker
at Hot Springs, told him the situation and that he only had
$25.00.   McCafferty told him not to worry, that he would get
the body, and they both went to the telegraph office, where
McCafferty told the agent in charge of the conditions and of the
desire to bring the remains to Arkansas.   The agent wrote out
the message sued on, and it was forwarded without any infor-
mation given by him at that time, relative to the strike existing
on appellant's lines, which fact was known by McCafferty in a
general way.   After sending the message, he went back to Mrs.
Parvins, the lady who had received the information of the death
over her 'phone, and advised him of it, to telephone his daughter.
Mrs. Parvin then told him of a long distance telephone call for
him from Terre Haute, not giving the name of the party, who
desired to talk with him.   He refused to go to the telephone to
answer the call, as he had no money to pay for it, admitting that
he knew the message must be about the body of his son, and said
to Mrs. Parvin that he had made all arrangements, had wired
for the body through the telegraph company and got McCafferty
to take the matter up for him and was resting on McCafferty's
judgment, and depending on the telegram.   He had given Mc-
Cafferty all the money he had, either $23 or $25, and Mc-
Cafferty had guaranteed the balance, but he might have made
arrangements to borrow money to pay for the long distance
message if he had tried to.   He thought the telegram was
sufficient, and was disgusted with Mrs. Parvin's service, who
had forgotten the name of the undertaker in the first instance
and caused him to expend $4.00 in 'phoning to Hickman.

It was E. V. Sinclair who had the body in charge, who called
appellee over the long distance 'phone, and, being advised that
Ivy would not accept the message and pay for it, he told the
operator to get him, and that he (Sinclair) would pay for the
message, and received the reply that Ivy would not come to
the 'phone.

He also stated that he would not have shipped the body

for $30, had the telegram been delivered to him, as it would have required $65 to cover the expenses; the express charges alone amounting to $35. Neither would he have shipped the body had he received the telegram, and it had said $65, until the money was put up with the express company, and he would have notified them to deposit it with the express company first; stated also that there was no undertaker in Terre Haute named St. Clair, and that his name and address was in all of the telephone directories of the city as a funeral director and in the undertakers' list and also in the city directory under the head of undertakers, and also in the classified list of business firms; that he would have probably got the telegram had it reached Terre Haute; that he received the body of Leo Ivy on August 28, and buried it on the 31st about 4 o'clock in the afternoon, in the Highland Lawn Cemetery, in the paupers' section; that the paupers from the poor farm were not buried there; that he thought those who died in the city prison were buried in the same section; that there are persons there, whose graves are paid for and that the negroes have a separate place set apart for them; that there was no undertaker by the name of E. V. St. Clair in the city, and that he did not know of any one of that name there; that he did not receive the message sued upon. He did receive a message, after the burial, directed the same way; that the expense of disinterment and shipping the remains after burial would be about $125.

Mrs. Parvin testified: That on the morning the message was sent there was a 'phone call at her house from Memphis for Mr. Ivy. She went to Mr. Newcomb's house, and found Mr. Ivy there and told him that she had a message that his son, Leo, was dead in Terre Haute; that she had forgotten the name of the undertaker. They got an undertaker in Hot Springs to call over the names of two or three of the undertakers in Terre Haute, and she thought Hickman sounded like the name given. They decided to call up Hickman, and he told them the body was at Sinclair's. She called Mr. Ivy and told him the name of the undertaker. After this a telephone call came for Mr. Ivy from Terre Haute. They called at her house. Mr Ivy was there, and she called him to the 'phone. He answered the 'phone, and she heard him say: "I haven't any more to do with it; I have turned it over to McCafferty."

She did not know what was said at the other end of the line. That was in the afternoon of the 30th.

The plaintiff and his family went to Traskwood on the next morning, Saturday, August 31, and they incurred about $40 expense in railroad fare, board, and making arrangements for the burial of the body. In the afternoon, about 4 o'clock he telephoned McCafferty in Hot Springs to know if he had heard from the message, and McCafferty told him that he had not, but to be patient. He waited until Sunday afternoon, and 'phoned McCafferty again, who urged him to wait. He took the train back to Hot Springs about 10 o'clock Sunday night, on September 1, and could not get communication over the 'phone with Terre Haute.

The testimony shows that the printed words stamped on the message, "SUBJECT TO INDEFINITE DELAY," were not put there by the clerk at the receiving office, when the message was taken for transmission, but at the general office, after it had been sent in.

The defendant offered to prove that a strike was in effect on its lines; that the message upon its receipt was immediately forwarded to St. Louis, and sent from there to Terre Haute, after that office had been called and had answered, but had not in fact been received at the place of destination, and it was thought that some striking employee or some employee in sympathy with the strikers had answered the call and diverted the message to damage the company.

This testimony the court refused to admit because the plaintiff had not been notified of the strike at the time of sending the message.

This case was tried in the Federal court, and is reported in 177 Federal Reporter, 63, and it was stipulated that the evidence introduced in the trial in that court, as shown by the printed record, should be used on the trial in this, subject to objections for incompetency and irrelevancy.

The court instructed the jury, giving certain instructions requested by the plaintiff, over defendant's objections; declined to give defendant's request for a peremptory instruction and certain other instructions requested by it.

The jury returned a verdict for $1,000 for the plaintiff, and from the judgment thereon the defendant appealed.

*George H. Fearons* and *Rose, Hemingway, Cantrell & Loughborough,* for appellant.

*Whipple & Whipple,* for appellee.

KIRBY, J., (after stating the facts). There are several assignments of error, but such only will be noticed as we regard necessary to consider in the determination of the cause.

It is insisted strongly that the court erred in not directing a verdict for the appellant, and we agree with this contention. The damages proved in this case and resulting, aside and separate from mental anguish, amounted to about $40, and the remainder of the verdict must have been allowed on account of mental anguish. If it be conceded that such damages would have resulted from the failure to deliver the telegram, which is not altogether certain, since the undertaker having the body for interment stated that he would not have forwarded it for the amount mentioned in the telegram nor for the larger amount he would have charged until it was secured by being put up with the express company, all of which presupposes that negotiations would have continued from the receipt of the telegram by Sinclair until satisfactorily concluded by the depositing by appellee of the amount necessary to procure a shipment of the body with the express company; but we do not deem it necessary to pass upon this question. The testimony is undisputed, however that the undertaker, to whom the telegram was intended to be sent, and who had the body in charge, after the telegram was sent from Hot Springs, called the appellee over the long distance 'phone at Hot Springs, having been advised by Hickman, who had previously been called up on the 'phone by appellee and inquired of concerning the body of his son, about which he had telegraphed to Terre Haute, and also sent the 'phone message. That he declined to answer the call and talk with the undertaker, giving as his reason that he did not have the $4.00 to expend in payment for the call, and that he relied upon the telegram that he had already sent.

It is further undisputed that Sinclair instructed the telephone operator at Hot Springs, upon being advised that appellee had no money to pay for the message, that he would pay for it, and that she then advised him, Sinclair, that appellee refused to come to the 'phone. Appellee does not deny that he

talked over Mrs. Parvin's 'phone to the central office, after being notified of the long distance call from Terre Haute for him after his telegram was sent, and told the operator, "I haven't any more to do with it. I have turned it over to Mc-Cafferty." Although he did say that he had no notice that the person desiring to talk with him would pay the expense of the message.

It can not be doubted that appellee could have secured all the information he desired by answering the telephone call of Sinclair, and have had ample opportunity to make any arrangement within his power to procure the shipment of the body of his son for burial or interment in the family burying grounds, and thus prevented all damage resulting from the failure of the delivery of his telegram by so doing. A slight exertion on his part in merely answering the 'phone, and in any event a trifling expenditure of $4.00, and remaining a little while at the 'phone, over which he declined to receive the long distance message from the central office at Hot Springs, would have prevented all but nominal damages. It was clearly his duty to use reasonable effort to lessen any damage that might result from defendant's breach of its contract and negligence in failing to deliver the telegram.

The rule is: "That where a party is entitled to the benefit of a contract and can save himself from a loss arising from the breach of it, at a trifling expense or with reasonable exertions, it is his duty to do it, and he can charge the delinquent with such damages only as with reasonable endeavors and expense he could not prevent." *Warren* v. *Stoddard* 105 U. S. 224, 26 L. Ed. 1117; *St. Louis, I. M. & S. Ry. Co.* v. *Ayres,* 67 Ark. 371.

And it makes no difference whether this case be regarded as one arising out of contract or tort, since the principle that the injured party must reasonably exert himself to prevent damage applies alike to cases of both kinds. Sutherland on Damages, § 90.

Appellee insists, however, that the jury was properly instructed as to contributory negligence, and that it was a question for them, and, having found in his favor, the judgment should be affirmed.

As already stated, the evidence is undisputed, and we do

not think it can be said that the minds of reasonable men would differ as to the duty of appellee to answer the long distance call which could have been in reply to his telegram, and which he knew was about the same matter, and receive information of everything he desired to know, and which was necessary to securing the shipment of the body of his son for burial and thereby prevent any but nominal damages resulting from plaintiff's failure to deliver the telegram, and, such being the case, it was not a question for the jury.

Plaintiff, having failed to perform this simple duty, is not entitled to recover more than nominal damages, and the judgment is reversed, and judgment will be entered here for such damages.

It is so ordered.