# JOHN J. CARLIN

*vs.*

# THOMAS E. BIDDISON.

*Non-Delivery of Merchandise Sold—Secondhand Lumber—
Damages—Instructions—Evidence—Qualification of Wit-
ness—Leading Questions.*

A witness who stated that he was not familiar with the price
of lumber of a particular kind at a certain time was not compe-
tent to testify as to its value at that time.                     p. 466

A witness who said that he had bought very little secondhand
lumber and that he could tell its value only "for his purposes"
was not competent to testify as to the value of a particular lot
of secondhand lumber.                                             p. 466

The refusal to allow plaintiff to testify as to the condition of
such part of lumber contracted for as was delivered by defend-
ant, as compared with that not delivered, *held* not cause for
reversal, this matter having been previously covered by plain-
tiff's testimony.                                                 p. 466

The circumstances under which leading questions may be
asked are matters largely in the discretion of the trial court,
and the allowance of such questions to be asked of defendant's
witnesses was not cause for reversal when the answers thereto
simply contradicted plaintiff's testimony as to certain features of
the contract in suit, in support of defendant's previous testi-
mony as to the terms thereof.                                     p. 467

In an action for breach of a contract for the sale of lumber
constituting part of the structure of a building belonging to
defendant, the wrongful admission of an advertisement for the
sale or lease of the building was not cause for reversal at the
instance of plaintiff, when he himself had testified that defend-
ant told him that he had been trying to sell the building.  p. 467

Defendant's version of his contract with plaintiff being that he had thereby sold only such of the lumber on his premises as he could not use himself in the erection of some houses which he proposed to build, evidence that such lumber as defendant did not allow plaintiff to take was used by the former in the erection of houses was admissible for the purpose of showing that defendant complied with the contract according to his version thereof.                                         p. 468

In an action for the breach of a contract by which defendant agreed to sell to plaintiff the secondhand lumber on the former's premises, wherein plaintiff alleged that he had to purchase new lumber of a different kind in partial substitution for the part of defendant's lumber which was not delivered as agreed, it was proper to refuse an instruction that plaintiff was entitled to recover the difference between the balance of undelivered lumber and the price plaintiff was compelled to pay in the open market to replace said balance, it failing to submit to the jury the question whether lumber such as was contracted for could have been obtained by plaintiff "on the market." and whether the lumber purchased by him was the best substitute. pp. 469-470

The lumber purchased by plaintiff on the market being less in quantity than the balance undelivered, the requested instruction was misleading in stating that plaintiff was entitled to recover the difference between the balance of undelivered lumber and the price he was compelled to pay in the open market.
                                                      p. 470

That lumber was sold plaintiff by defendant at a named price per one thousand feet; that defendant delivered only part of that sold, and that plaintiff claimed such part to be inferior to the average of the lumber sold, did not justify an instruction that the jury should allow plaintiff such damages as would fairly compensate him for such inferior lumber, since this either meant that plaintiff might, while retaining the lumber delivered, recover the amount paid by him therefor, or it failed to furnish any guide in determining damages.            p. 471

There being no evidence as to the value of the part of the lumber delivered, other than the price per thousand feet named in the contract, nor any evidence as to the value of lumber of the average quality of the entire quantity sold, it was proper

to refuse an instruction that plaintiff could recover the difference between such values, and to grant an instruction that there was no evidence legally sufficient to entitle plaintiff to recover under a count alleging plaintiff's loss by reason of the inferiority of the lumber delivered to the average quality of that sold.

pp. 471, 472

That plaintiff accepted and paid for the lumber delivered by defendant under his contract could not have involved a waiver of his right to claim on account of the inferior quality thereof, had there been any evidence by which to determine the resulting loss.  p. 473

*Decided January 13th, 1920.*

Appeal from the Baltimore City Court (DUFFY, J.).

The cause was argued before BOYD, C. J., BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and ADKINS, JJ.

*Edward M. Hammond,* for the appellant.

*Gordon Gambrill* and *Albert S. J. Owens,* with whom was *Howard Bryant* on the brief, for the appellee.

THOMAS, J., delivered the opinion of the Court.

This suit was brought in the Baltimore City Court to recover damages for the breach of an alleged contract to deliver to the plaintiff one hundred thousand feet of second-hand lumber.

The declaration as originally filed contained the six common counts in assumpsit for goods bargained and sold; "for work done and materials provided"; for money lent; for money paid; for money received by the defendant, and for money found to be due on accounts stated, and four special

counts. On demurrer the eighth, ninth and tenth counts were stricken out. The seventh and tenth counts were amended, and the case was tried on issues joined on general issue pleas to the several counts.

The amended seventh count alleged that on or about the 17th of April, 1917, the defendant sold to the plaintiff 100,-000 feet of lumber at $16.50 per thousand to be delivered to the plaintiff; that the defendant

"delivered to the plaintiff 28,000 feet thereof on account of said contract, and received on account of the total purchase price $470.52; that thereafter the defendant failed, neglected and refused to deliver * * * the balance of said 100,000 feet of lumber, and as a result thereof the plaintiff was compelled to go into the open market and purchase 55,000 feet in lieu thereof at a cost greatly in excess of $16.50 per thousand, to wit, $41.50 per thousand; and the plaintiff further lost the difference between the value of the lumber sold to him by the defendant and the market value of lumber of a similar character, to wit, $25.00 per thousand for 17,-000 feet."

The amended tenth count alleged that on or about the 17th of April, 1917, the defendant sold to the plaintiff

"certain lumber at Baltimore, Maryland, to wit, 100,000 feet at $16.50 per thousand, said lumber to be of an average quality to be delivered to the plaintiff on the ground of the defendant at the Monumental Brewing Company's plant, Frederick avenue near Smallwood street; that the defendant delivered to the plaintiff on said ground about 28,000 feet of said 100,000 feet, but the said 28,000 feet was of such poor character and quality that it did not average up to the average quality and standard of the whole 100,000 feet, and as a result thereof the plaintiff suffered great loss and damage."

During the trial, which resulted in a verdict and judgment for the defendant, the plaintiff reserved eighteen exceptions

to rulings on the evidence, and a further exception to the action of the Court on the prayers.

The plaintiff offered evidence tending to show that the defendant owned the property in Baltimore City formerly owned or occupied by the Monumental Brewing Company, on Frederick avenue and Smallwood street; that in March 1917, the defendant told the plaintiff he had a large quantity of heavy timbers and asked him if he could make use of them, and that the plaintiff told him that he had no use for them at that time; that about the 14th of April, 1917, the plaintiff called the defendant up and asked him if he had sold the timbers, and the defendant told him that he had not sold them but was anxious to do so; that plaintiff asked him where the timbers were, and that the defendant said they were at the Monumental Brewery, and that plaintiff said he would go down and "look them over"; that the plaintiff and his architect, Mr. S. Russell, went down to the brewery property the following Saturday to go "over the situation" and see the timbers. The plaintiff's testimony as to what they found, and what subsequently occurred betweeen him and the defendant is as follows: "The site was the location of a brewery with all the necessary stables and ice houses, buildings that seem to be required for that purpose, and the smaller buildings were wrecked, part of the walls was lying down and some of ends of the timbers was still hanging up in the wall, leaving them on a slant, one end on the ground and the other end in the wall, and the stuff was scattered all over the ground so that there was not any available space for any more than to pull a wagon in, the whole lot was practically covered with this debris. We looked over the timbers. We saw the condition of the stuff in these stables and ice houses and one thing and another, and that had the ends rotted and was full of nails and spikes, and very unusual sizes, which in itself would have been worth nothing to me, but I went into the two buildings that were standing there, and those buildings had a good many joists, three by twelve and ten by

ten posts, and girders going all the way through, one on a floor; the ceilings were very low in those buildings and each floor had a big girder, I imagine they were 12 by 14 or 14 by 16, all good, clean, Georgia pine, and by taking all the timber on the place in our calculations we decided that we could make plans and build the building really to suit these timbers. So Mr. Russell sketched the layout on Sunday and Monday morning I called up Mr. Biddison (the defendant) and told him that I thought if we could agree on a price that I could use the lumber that he had down there, and the result of that conversation was that I made an appointment to meet him at Mr. Russell's office, 2900 Clifton avenue. * * * He (Mr. Russell) is the architect and consulting man that I had, and we made an appointment to meet him at eight o'clock Tuesday evening. I took my working foreman, who is another Mr. Russell, with me, and went to Mr. Russell's office. We waited there from eight to something after nine and finally Mr. Biddison came in. We first discussed some general topics. The first question I put to Mr. Biddison was, 'Mr. Biddison, what are you going to do about the lumber that is in those buildings,' standing there, as that was one of the fundamental elements of the whole proposition, and he said, 'Why, I am going to tear them down just as soon as I can get the lumber cleaned up off the ground, they have been in the hands of a real estate man for sale, but he has not sold them, and I am going to take them away from him and tear them down.' I asked him what he wanted a thousand for the lumber, both in the buildings and that on the ground. He said, 'Twenty dollars a thousand.' I told him I did not think it was worth twenty dollars a thousand to me, but I would give him fifteen dollars for it. We haggled about the price for a while, and finally Mr. Biddison got up and stood in the doorway and said, 'Well, he was going to leave, but he would take sixteen dollars and a half a thousand for the lumber that was there.' I asked him how much he thought he had there and he said it was consider-

ably over one hundred thousand feet. I studied over the matter for a little while and very deliberately and carefully said, 'Mr. Biddison, I will take one hundred thousand feet of the lumber that you have there at sixteen dollars and fifty cents a thousand, providing it includes what is on the ground and in the building, and providing that you will give it to me as fast as I want to use it.' He said 'All right, don't you worry about giving it to you fast enough, all I want you to do is to come down there and clean it up off the ground and I will start in and tear the buildings down right away.' " The plaintiff further testified that the defendant delivered to him 28,559 feet of the lumber that was on the ground at the time the alleged contract was made, and that he paid for it $471.12, as it was delivered, according to the terms of the contract, but that the defendant afterwards refused to tear down the buildings that were standing on the property, or to deliver the lumber that was in them; that the plaintiff, in consequence of the defendant's refusal to tear down said buildings or to deliver any more lumber, in order to complete the building he was erecting, had "to go on the market" and buy 55,000 feet of lumber to take the place of the lumber defendant refused to deliver, for which he paid $41.50 per thousand feet; that the lumber he purchased on the market was Virginia pine, and inferior to the lumber he purchased from the defendant, which was Georgia pine, and that he did not know where he could have gotten lumber of the kind the defendant sold him, and that the lumber he purchased in its place was the "nearest" thing he could get; that he paid for the 55,000 feet $1,375.00 more than it would have cost him at the contract price, and that he tried to get the cheapest lumber he could get that would answer his purposes, and did not try to "duplicate" the lumber he bought from the defendant; that the nearest thing to the Georgia pine in the buildings that he could have gotten on the market, in Baltimore City in the spring of 1917, was long leaf Georgia pine; that he was not familiar with the price of long leaf Georgia

pine in 1917, but that it was much higher than Virginia pine.

After the foregoing testimony, the plaintiff was asked by his counsel to tell the price, in May, 1917, of Georgia pine of the sizes in the defendant's building. The question was objected to, and counsel for the plaintiff offered to prove in answer to the question that in May, 1917, the Georgia pine that could have been gotten in the open market in Baltimore would have cost between $65.00 and $70.00, and that it was not of as good quality as the Georgia pine in defendant's buildings, and the first exception was to the refusal of the Court to allow the question to be asked and answered. Plaintiff was then asked to state the value of the 17,000 feet of lumber in defendant's building, not delivered to him, and when the question was objected to on the ground that it did not appear that the plaintiff was qualified to state the value of such lumber, his counsel asked him if he had ever bought any second-hand lumber, and he replied, "Not a great quantity." He was then asked, "Have you bought some?" and he replied, "Some little, yes, sir." He was then asked, "When you say 'some little,' what do you mean, give it to us in thousands of feet, have you estimated on it?" and he replied, "Not to any extent, Mr. Hammond, no, sir." He was then asked: "Can you tell his Honor whether you are qualified to give us the value of the lumber that was in the defendant's buildings in 1917?" And he replied: "For my purposes, absolutely, yes, sir." He was then asked the following question: "You have testified that the part of the lumber that you did get from Mr. Biddison 28,000 feet, you have described that as being full of nails, the ends being decayed; how did that part that you did get compare with the part that you inspected and did not get," and upon objection to the question counsel for the plaintiff offered to prove in answer to the question that the 28,000 feet delivered was inferior in every way to the balance of the 100,000 feet the plaintiff was to get, and the second exception was to the re-

fusal of the Court to admit the evidence. The third exception was to the refusal of the Court to allow the plaintiff to answer the following question: "What was the difference in value between the 28,000 feet you did get and the whole 100,000 feet that you were to have gotten under the contract?" There was no reversible error in either of these rulings. Apart from any other consideration, it is clear that the plaintiff was not competent to testify to the value of Georgia pine in May, 1917, for he had distinctly said that he was not familiar with the price at that time, nor was he competent to testify to the value of the lumber on the ground, or in the defendant's buildings, for he had said that he had bought very little second-hand lumber, and that he could only tell the value of it *for his purposes.* The evidence referred to in the second exception, in so far as it related to the *condition* of the lumber that was on the ground, *i. e.,* the lumber that was delivered to the plaintiff, as compared with the *condition* of the lumber in the buildings, had already been covered by the plaintiff's testimony, and he could not therefore have been injured by the rejection of the evidence embraced in that exception.

On cross-examination the plaintiff stated that the defendant, at the time the contract was made, was getting ready to erect some houses on the brewery lot, and that he had to get the old material out of the way before he could build them, and that that was the reason the defendant wanted to sell the lumber to him. He was then asked the following question: "Don't you know, as a matter of fact, that Mr. Biddison was building houses and he proposed to use and utilize all the material in the building that he could for his own construction?" And the fourth exception is to the action of the Court permitting the question to be answered. The plaintiff's reply was: "I understood at the time he was going to build some houses there and was going to use the brick and material that was suitable for building small two-story houses, and I also knew that it was absolutely necessary for Mr.

Biddison to get some one to clean up this mess that was on the outside before he could proceed with his houses too." Independently of the question whether the evidence elicited by the question was admissible for the purpose of showing the subject matter of the contract, and the surrounding circumstances, as reflecting upon the understanding of the parties to the agreement (*Machen* v. *Hooper,* 73 Md. 342), the answer of the witness did not injure the plaintiff, for to the extent that it tended to show that the plaintiff did not purchase the *small lumber* suitable for construction of small two-story houses such as the defendant was about to erect on the lot, it was rather in accord with other testimony of the plaintiff.

The questions in the fifth, sixth, seventh and eighth exceptions were objected to on the ground that they were leading. Assuming that they were open to that objection, the circumstances under which such questions may be asked is a matter largely in the discretion of the trial Court (*Buschman* v. *Morling,* 30 Md. 384), and the answers thereto simply contradicted the plaintiff's testimony as to certain features of the contract, in support of the previous testimony of the defendant as to the terms of the agreement to the effect that he did not sell the plaintiff a definite quantity of lumber, or agree to tear down the buildings on the property.

The ninth, tenth, eleventh, twelfth, thirteenth and fourteenth exceptions were to the admission in evidence of an advertisement, as of April 11th, 1917, in the *Baltimore Sun* of the warehouse on the property for sale or lease. This evidence was irrelevant and inadmissible, but we do not see how the plaintiff could have been injured by it, for he had testified that the defendant told him at the time the alleged contract was made that he had been trying to sell the buildings, and that they were "in the hands of a real estate man for sale," but that he was going to take them away from him "and tear them down."

The fifteen, sixteen and seventeenth exceptions were to the testimony of Philip M. Lemmon, who superintended the

building of the small houses the defendant was erecting on
the brewery lot, stating what lumber he allowed the plaintiff's
agent to take, and that he used the other lumber in the erec-
tion of defendant's houses. According to the defendant's ver-
sion of his contract with the plaintiff, he sold the plaintiff
only such lumber as he could not use in the erection of his
houses, and the evidence referred to in these exceptions tended
to show that he delivered to the plaintiff the lumber that he
could not use, and that he made such use of the lumber that
he did not deliver to the plaintiff. This evidence was ad-
missible for the purpose of showing that the defendant com-
plied with the contract according to his version of it.

As we have already indicated, the defendant offered evi-
dence tending to show that he sold the plaintiff only such of
the lumber on the ground as he could not use in the erection
of a number of small houses on the brewery lot, that he did
not sell the plaintiff 100,000 feet of lumber, and did not
promise to tear down the buildings on the property.

The eighteenth exception was abandoned in this Court, and
the remaining exception was to the ruling of the Court below
on the prayers. The objections urged against this ruling are
to the rejection of plaintiff's first and second prayers, and to
the granting of defendant's first and seventh prayers. The
first and second prayers of the plaintiff are as follows:

*First*—"The jury are instructed that if they believe from
the evidence that the defendant agreed to sell to the plaintiff
100,000 feet of lumber in the buildings mentioned in the
evidence at the price of $16.50 per thousand feet, plaintiff to
haul same from the defendant's ground, and if they further
find that the plaintiff received but about 28,000 feet thereof
from the defendant and paid the defendant for the same, and
the defendant failed to deliver the balance, and if they fur-
ther find that the plaintiff was compelled to go on the mar-
ket and purchase lumber to replace such lumber as the defend-
ant failed to deliver (if any), then the jury are to find for
the plaintiff and in estimating the damages under the seventh

count of the plaintiff's declaration, they are to allow the plaintiff the difference between the balance of said undelivered lumber (if any) and the price the plaintiff was compelled to pay in the open market for lumber to replace said balance, if the jury so find."

*Second*—"The jury are instructed that if they believe from the evidence that the defendant agreed to sell to the plaintiff 100,000 feet of lumber in the buildings mentioned in the evidence at the price of $16.50 per thousand feet, plaintiff to haul the same from the defendant's ground, and if they further find that the plaintiff received but about 28,000 feet thereof from the defendant and paid the defendant for the same, and the defendant failed to deliver the balance, and if they further find that the 28,000 feet of lumber so delivered was inferior to the average of the whole 100,000 feet, if the jury so find, then the plaintiff is entitled to recover in this action for such damaged lumber delivered as the jury may find, if any, and in estimating the damages, the jury are to allow the plaintiff such sum as will, under the pleadings and evidence in this case, fairly compensate the plaintiff for such damaged lumber, if the jury so find."

In support of his first prayer the appellant insists that where A., who has contracted with B. to deliver to him certain goods or property, delivers only a part, and there is no market for the article purchased, B. is entitled to purchase the best substitute, nearest in quality and price, and to recover as damages for the breach of the contract the difference between the contract price and the price paid for the substitute. He cites as authority for this contention *Hinde* v. *Liddell*, L. R. 10 Q. B. 265; *Gallagher* v. *Baird*, 54 App. Div. (N. Y.) 398, 170 N. Y. 566; *Warren* v. *Stoddart*, 105 U. S. 224; *Marsh* v. *McPherson*, 105 U. S. 709; *Benjamin on Sales* (5th Eng. Ed.), 987; *Williston on Sales*, 1909, Sec. 599; *Mechem on Sales* (1901), Vol. 2, Sec. 1768. Without expressing any opinion as to the correctness of the rule as stated, or as to whether it is applicable to the pleadings and

evidence in this case, it is apparent that it involves the question of a market for the article contracted for, and the question of the purchase by the plaintiff of the best substitute. Both of these questions were questions of fact for the jury, and neither of them were submitted to the jury by the plaintiff's prayer. The lumber the defendant agreed to deliver was *second-hand* lumber, and it is conceded that the lumber the plaintiff purchased in its place was *new lumber.* Under the rule contended for the jury could not have allowed the plaintiff the difference between the contract price for the second-hand lumber and the price paid for the new lumber unless the jury found from the evidence that the lumber contracted for could not be obtained "on the market," and that the lumber purchased in its place was the best substitute. In addition to the defect pointed out, the prayer required the jury to allow the plaintiff "the difference between the balance of said undelivered lumber and the price the plaintiff was compelled to pay in the open market for lumber to replace said balance." This language was calculated to mislead the jury. The only lumber purchased by the plaintiff in the open market was the 55,000 feet. The prayer did not instruct the jury to allow the plaintiff the difference between the contract price of *that* lumber and the price the plaintiff paid for *it,* but to allow the plaintiff "the difference between the balance of the undelivered lumber" and the price the plaintiff was compelled to pay "for lumber to replace said balance." If the prayer was framed with the view of including all the lumber not delivered—the 55,000 feet as well as the balance—it was not less calculated to confuse the jury, and it was even more important, under the rule suggested in *Benjamin on Sales, supra,* for the jury to have found the market value of the lumber sold by the defendant at the time of the breach of the contract, or, in case there was "no market" for such lumber, the market value "or price of the best substitute."

The plaintiff's second prayer has reference to the 28,000 feet of lumber that was in the buildings that had been pulled down or wrecked before the alleged contract was made. It was inspected by the plaintiff, and by his architect, before he agreed to purchase it from the defendant, and moreover there was no evidence or claim in this case that that particular lumber was inferior to what the plaintiff expected or the defendant represented it to be. But the theory of the appellant is that he agreed to purchase that 28,000 feet along with the balance of the 100,000 feet; that the balance of the lumber was of a very much better quality; that the quality of the 28,000 feet was inferior to the average quality of the 100,000 feet, and that as defendant failed to deliver the balance he suffered a loss in taking and paying for the 28,000 feet at the contract price for the 100,000 feet. It would seem, on this theory of the case, that the only loss the plaintiff could have sustained by accepting and paying for the 28,000 feet at the contract price for the whole 100,000 feet would have been the difference between the value of the 28,000 feet and the contract price which he paid. Assuming that such a loss could, under the circumstances of this case, be recovered as a separate item of damages, it is obvious that the prayer was defective in that it directed the jury to "allow such sum as will * * * fairly compensate the plaintiff for such damaged lumber." If the prayer meant that the jury should allow the plaintiff what he paid for the lumber it was clearly wrong, for the plaintiff could not retain the lumber and at the same time recover the amount he paid for it. If the prayer did not mean that, then it did not furnish the jury any guide in arriving at compensation. In addition to these objections, there was no evidence in the case of the value of the 28,000 feet delivered *other than the contract price,* and if that had been adopted as its value the plaintiff sustained no loss in accepting and paying for the lumber. The case of *Sloan v. Allegheny Company,* 91 Md. 501, is authority for the proposition that where a vendor fails to deliver goods of the quality

contracted for, the measure of damages is the difference between the value of the goods contracted for and the value of the goods delivered. In this case, so far as the 28,000 feet of lumber is concerned, the identical property contracted for was delivered. It would seem from the argument of counsel for the appellant that his view of the measure of damages the plaintiff was entitled to recover is the difference between the value of the lumber delivered and the value of lumber of the quality of the average quality of the 100,000 feet sold to him. But even if we could adopt his view, it would not sustain the plaintiff's second prayer, for there was no evidence in the case of the value of lumber of the quality of the average quality of the 100,000 feet sold. The evidence of what the plaintiff paid for the 55,000 feet related to lumber substituted for the lumber that was in the building, which was of a better quality than the lumber delivered.

There being no evidence in the case of the value of the 28,000 feet of lumber delivered to the plaintiff, or of the value of lumber of the quality of the average quality of the 100,000 feet alleged to have been sold to him, the defendant's first prayer properly instructed the jury that there was no evidence in the case legally sufficient to entitle the plaintiff to recover under the amended tenth count of the declaration.

The defendant's seventh prayer instructed the jury, "that if they find from all the evidence in the case that the plaintiff accepted and paid for the twenty-eight thousand feet of lumber as mentioned in the evidence, and further find that the plaintiff never made any complaint to the defendant as to the quality of said lumber, then if the jury so find, the plaintiff is not entitled to any damages in this action for or on account of the quality of the said twenty-eight thousand feet so delivered to the plaintiff by the defendant." This prayer, we think, proceeded upon the wrong theory. There was evidence tending to show that the plaintiff contracted to pay and did pay for the lumber as it was received, or during the week following delivery; that there was no defect in the

quality of the 28,000 feet delivered, and that the alleged breach of the contract did not occur until after that lumber was accepted and paid for and until the defendant refused to deliver the balance of the lumber. Under such circumstances the acceptance of the lumber without complaint and the payment of the contract price could not amount to a waiver of a breach of the contract by the defendant, or estop the plaintiff from asserting a proper claim for any damages he sustained by reason of the failure of the defendant to deliver the balance of the lumber. But as we have said, assuming that the loss claimed by the plaintiff in connection with the 28,000 feet of lumber delivered to him could, under the circumstances of this case, be recovered as a separate item of damages, he could not have been injured by the granting of this prayer because, as we have pointed out in connection with his second prayer and defendant's first prayer, there was no evidence in the case from which the jury could have ascertained or determined such loss.

Finding no reversible error in any of the rulings of the Court below complained of, the judgment will be affirmed.

*Judgment affirmed, with costs.*