## ST. LOUIS SOUTHWESTERN RY. CO. OF TEXAS v. BROWN & CO. (No. 2694.)

(Court of Civil Appeals of Texas. Texarkana. Feb. 8, 1923.)

1. Carriers �824227(3)—Judgment against carrier for loss of hogs must be reversed in absence of evidence to support a finding as to their value.

In a shipper's action against a railroad company for the value of hogs escaped from the railway stock pen because of the negligent maintenance of the stock pen, a judgment for plaintiff must be reversed in the absence of evidence to support a finding as to the value of the hogs sued for.

2. Carriers �824217(2)—Shippers' fault and not fault of carrier as to defective stock pen held proximate cause of loss of hogs so that they could not recover.

Where shippers at 5 o'clock p. m. placed hogs in the carrier's stock pen preparatory to shipment, and, noticing a hole in the fence large enough for the hogs to get through, guarded it for a while, and then left to eat supper, and the hogs were loaded at 6:45 p. m., but 28 of them had escaped through the hole in the fence, no recovery for the hogs thus escaping can be had against the carrier, since the shippers should have guarded the hole for 30 or 40 minutes longer, or for trifling expense have repaired it; their immediate fault, and not the remote fault of the carrier, being the proximate cause of the loss.

Appeal from Titus County Court; Dan M. Cook, Judge.

Action by Brown & Co. against the St. Louis Southwestern Railway Company of Texas. Judgment for plaintiffs, and defendant appeals. Reversed and rendered.

The appellees brought the suit to recover the value of 28 head of hogs alleged to have escaped from the railway stock pen and strayed away by reason of the negligent maintenance of the stock pen by the railway company. The appellees claim and testified that they drove to town and placed in the stock pen of the railway company at Cookville 105 hogs, and then cared for and fed them, intending to tender them for shipment to Fort Worth, Tex., and that the railway agent afterwards accepted the shipment and issued a bill of lading therefor, but that 28 hogs escaped from the stock pen before they were loaded on the car. The bill of lading was issued by the railway agent shortly before the hogs were loaded on the car. The hogs, as appellees say, were "bottom raised" hogs, undomesticated, and that had to be "run with dogs" in order to "handle them." The appellees had seven or eight employees assisting in driving and caring for the hogs. The hogs arrived at Cookville and were placed in the stock pen about 5 o'clock p. m., January 10, 1922. One of the appellees testified as follows:

"We drove them in the stock pen about 5 o'clock p. m. There was a hole in the stock pen, in the northeast corner. A plank was off that made a hole about four or five feet long. We saw the hole when we first got there. We guarded it awhile. * * * We quit guarding the hole and went off uptown in order to get something to eat."

Appellees claim that the hogs escaped from the pen through that hole while they "were away" at supper, and this was, as it inferably appears, before the bill of lading was issued. The assistants, or employees, seem to have gone with the appellees to eat supper. The appellant denied that there was a delivery to it of more than 77 hogs for shipment. It was undisputed that the railway company transported and delivered 77 hogs to the consignees at Fort Worth. The following agreed facts are quoted from the record:

"The hogs were placed in the pen at 5 o'clock p. m. January 10, 1922. They were loaded at 6:45 p. m. same date, and moved same date about 8 p. m. on train 15."

The appellees and their employees loaded the hogs in the car.

After hearing the evidence, the court entered judgment for the appellees, finding $288.79 as the value of the 28 hogs.

J. M. Burford, of Dallas, for appellant.

Wilkinson & Cook, of Mt. Pleasant, for appellees.

LEVY, J. (after stating the facts as above). [1] It is insisted by appellant, and the statement of facts sustains the contention, that there is a lack of any evidence showing, or tending to show, the value of the hogs sued for. There is some evidence to show that the hogs would weigh as much as 190 pounds apiece, but no witness undertakes to testify about their selling price or market value. Consequently the finding of the court as to value, being without any evidence to support it, would have to be set aside, operating to reverse the judgment.

However, the more serious question is that of whether or not, in the evidence, the appellees are entitled to recover at all. In the first place, it does not satisfactorily appear from the evidence that at the time the hogs escaped from the stock pen they had been received by the railway company for transportation. It was shown that the appellees placed the hogs in the stock pen and then fed them, intending to tender them to the railway company for shipment, and that they were afterwards "delivered" to the railway company for shipment and a bill of lading was issued and delivered therefor. It further affirmatively appears that the hogs were loaded by appellees and their employees in a car at 6:45 o'clock p. m., shortly after the bill of lading was issued. The hogs, seem-

ingly, at the time of the escape were under the exclusive control and possession of the appellees, and had not been received by the railway company for shipment, and must have escaped because of appellees' own negligence in going off and leaving the hole in the fence open and unguarded at the time they went uptown to eat supper. The evidence seems to class the case as one within the ruling in Railway Co. v. Riley (Tex. App.) 1 S. W. 446. But assuming that view to be erroneous (as it may be), and concluding that it should be conclusively presumed from the evidence that the hogs had been delivered to and received by the railway company for shipment at a time before they escaped from the stock pen, the appellees nevertheless cannot legally recover in the special circumstances of this case for the damages sued for. The appellees in this case knew, as soon as the hogs were put in the stock pen, that there was a hole in the fence large enough for hogs to get through, and knew that the hogs were wild and would easily and quickly escape from the pen and run away if the hole was not guarded or closed in some way. The hogs were to remain in the stock pen only 1 hour and 45 minutes; that is, from 5 o'clock p. m. until they were loaded on the car at 6:45 p. m. For a part of that hour and 45 minutes some of the employees of appellees stayed at the stock pen and "guarded" the hole to keep the hogs from escaping; but the appellees, without need to do so, quit guarding the hole in the fence and went off and left it open and unguarded, knowing full well that the hogs would escape and be lost to them if the hole was not guarded or closed. It was then that the hogs escaped through the hole, and the entire loss caused. No loss or injury had occurred before and up to the time the appellees left the stock pen. It further appears that the appellees could have prevented the loss or lessened the damages either by guarding the hole for 30 or 40 minutes longer or by nailing a plank over the hole. There were seven or eight assistants there to assist in guarding the hole, which was a small one. The cost of a plank and nails to put it on was negligible, not exceeding 50 cents. Instead of putting forth such reasonable and simple efforts to prevent escape, the appellees voluntarily left the hogs to get out at the hole at will without hinderance.

[2] In these facts it is evident that the appellees with reasonable exertion or at trifling expense could have avoided the loss or minimized the damages in evidence. Was it their duty to do so? "A plaintiff must," as laid down in 1 Sedgw. Dam. pp. 164, 166, "not only show that no negligence on his part contributed originally to the injury, but he must also show due care in avoiding all (consequential) damages. It is also his duty, it is said, to take reasonable steps to make the damage as small as possible." The principle applies alike to cases of contract and tort that it is the duty of a party to use ordinary care and diligence to prevent the loss or minimize the damages that would otherwise result from the defendant's fault or negligence. 8 R. C. L. § 14, p. 442; 1 Sutherland on Dam. (3d Ed.) § 90, p. 262; Warren v. Stoddart, 105 U. S. 224, 26 L. Ed. 1117. That rule obtains in Texas. Ry. Co. v. Anderson, 85 Tex. 88, 19 S. W. 1025; Tel. Co. v. Jeanes, 88 Tex. 232, 31 S. W. 186; Brandon v. Mfg. Co., 51 Tex. 121. The exceptions to the rule are only where the act of the defendant was willful (Ry. Co. v. Zantzinger, 92 Tex. 365, 48 S. W. 563, 44 L. R. A. 553, 71 Am. St. Rep. 859), and where the repairs required skill calling for more than ordinary effort and moderate expense (Ry. Co. v. Young, 60 Tex. 201). The principle is illustrated in the case of Zantzinger, supra, in the following quotation:

"So, if one throw a stone and break a window, the cost of repairing a window is the ordinary measure of damage. But if the owner suffers the window to remain without repairing a great length of time after notice of the fact, and his furniture, or pictures, or other valuable articles, sustain damage, or the rain beats in and rots the window, this damage would be too remote."

It is evident in the record that the appellees failed to use reasonable efforts, as was their duty, to prevent the loss or minimize the damage, and that by reason of such failure the loss is greater than it otherwise would have been. Appellees were only required to use the reasonable effort, and with plenty of assistants there to do so, of further guarding the hole for 30 or 45 minutes longer, or of closing the hole by nailing a plank over it. The cost of the plank and the five or six nails and the labor required to fasten it on the posts would not have exceeded the moderate cost of 50 cents. It follows that in the special facts here the judgment should not have been for more than the cost of the prevention of the loss; but, as there was no such cost incurred, a judgment would have to be rendered in favor of the appellant.

It is kept in mind that contributory negligence cannot be charged against the shipper for "using" a cattle pen that is defective or badly kept. Ry. Co. v. Trawick, 80 Tex. 270, 15 S. W. 568, 18 S. W. 948. Neither is it undertaken in the instant case to hold appellees guilty of contributory negligence, based upon the act of using the stock pen, because there was a hole in the fence. The appellees are here denied a recovery for the damages sued for solely upon the ground that such damages could have been avoided by timely and reasonable preventive measures by them as was their duty to exert for that purpose, and therefore immediate fault of the appellees, and not the remote fault in the first in-

stance of the railway company, was the real producing or proximate cause of the loss or damage suffered.

The judgment is reversed, and judgment is here rendered in favor of the appellant, with all costs.

---

⬅➡For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error refused March 28, 1923.